ELI LILLY AND COMPANY

v.

HOME INSURANCE COMPANY, et al.

Firemen's Fund Insurance Company, Appellant [1].

No. 84–5391.

United States Court of Appeals, District of Columbia Circuit.

June 24, 1986.

1. Consolidated with the following cases (identified by this court's case number and appellant(s)), in all of which Eli Lilly & Company is the appellee: 84–5394, Zurich American Insurance Company; 84–5395, International Surplus Lines Insurance Company et al.; 84–5396, Interstate Fire & Casualty Company et al.; 84–5397, American Employers' Insurance Company; 84–5398, Falcon Insurance Company; 84–5399, Mutual Fire, Marine & Inland Insurance Company; 84–5400, St. Paul Fire & Marine Insurance Company; 84–5401, American Home Assurance Co. et al.; 84–5402, Insurance Company of North America et al.; 84–5403, American Motorists Insurance Company et al.; 84–5404, Aetna Casualty & Surety Company et al.; 84–5405, Allan Peter Denis Haycock and Paul Malcolm Johnson et al.; 84–5406, Home Insurance Company; and 84–5407, Travelers Indemnity Company.

George Marshall Moriarty, Kenneth W. Erickson, Boston, Mass., Michael Nussbaum, Earl C. Dudley, Jr., Dennis M. Flannery, A. Stephen Hut, Jr., Washington, D.C., Sheila L. Birnbaum, New York City, Lawrence E. Carr, Jr., James F. Lee, Jr., Washington, D.C., James E. Rocap, III, Indianapolis, Ind., Stephen L. Nightingale, Washington, D.C., James P. Schaller, M. Elizabeth Medaglia, Brendan V. Sullivan, Jr., John J. Buckely, Jr., R. Harrison, Pledger, William John Hickey, Jr., Richard H. Gimer, Brian C. Shevlin, James C. Gregg and James E. Greene were on the supplemental brief following remand for appellants.

Theodore R. Boehm, Christopher G. Scanlon, Indianapolis, Ind., Ralph Earle II, and Michael A. Nardolilli, Washington, D.C.,

were on the supplemental brief following remand for appellee.

Before EDWARDS and SCALIA, Circuit Judges, and WRIGHT, Senior Circuit Judge.[2]

Opinion for the court filed by Senior Circuit Judge WRIGHT.

J. SKELLY WRIGHT, Senior Circuit Judge:

In *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876 (D.C.Cir.1985) (*Eli Lilly I*), this court certified several legal questions to the Supreme Court of Indiana concerning the scope of insurance coverage for the manufacturer of the drug DES. The Indiana court having issued an opinion answering our questions, the case is once again before us. The Indiana court held that under Indiana law extrinsic evidence would not be considered in construction of an ambiguous term in an insurance contract. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467 (Ind.1985). It further held that in the case of the contract before this court "coverage is triggered at any point between ingestion of DES and the manifestation of a DES-related disease." *Id.* at 470–471. These holdings dictate affirmance of the order of the District Court granting appellee's summary judgment motion on its declaratory claim.[3]

## I. BACKGROUND

### A. *The DES Dispute*

From the late 1940's until 1971 doctors often prescribed the drug DES (diethylstilbestrol) to pregnant women to help prevent miscarriages. In 1970, however, researchers reported a connection between ingestion of DES and development of cancers in the DES users' daughters who were *in utero* at the time the drug was taken. Massive tort litigation followed, much of it

2. Judge Tamm, a member of the panel of this court that issued the certification decision, died before the Indiana Supreme Court remanded the case to this court. Judge Scalia was selected to replace Judge Tamm following the Indiana court's remand. Judge Wald subsequently recused herself and was replaced by Judge Edwards.

3. In *Eli Lilly I* this court reserved decision on the personal jurisdiction and venue objections of three excess insurance companies. We now address these objections and find them without merit. *See* Part IV *infra.*

against appellee Eli Lilly, one of the largest manufacturers of DES.[4]

From the time it first produced DES until 1976 Eli Lilly purchased some 242 insurance policies to cover its DES risks. All of these policies provided that the insurer would indemnify Lilly for its tort liabilities if the underlying tort suit were based on an "injury" that occurred during the policy period.[5] The term "injury" is not defined with precision in the policies themselves. *See* 2 Joint Appendix (JA) 96. Nor is the time at which injury "occurs" self-evident. Given that cancer often only develops when a DES daughter is between 15 and 25 years of age, Memorandum Opinion filed April 12, 1984 (Mem.Op.) at 4 n. * * * (D.D.C. Civil Action No. 82–669), 5 JA 697, it was not unusual for several insurance companies to have issued insurance policies to Lilly during the period between ingestion of DES and manifestation of the first diagnosable symptoms.

When Lilly notified its insurers of the DES claims filed against it, the insurers responded by adopting conflicting interpretations of the term "injury." *See Eli Lilly I,* 764 F.2d at 880. The general thrust of each insurance company's interpretation, however, was that some *other* insurance company was on the risk at the time the "injury" occurred. According to the District Court:

> In general, those insurers at risk prior to the diagnosis of DES-related diseases took the position that policies in force on the "date of manifestation" of the injury covered DES claims. Similarly, those insurers whose policies were in force on the date of manifestation of DES-related injuries took the position that policies in force on the date of ingestion of DES covered DES claims.

Mem.Op. at 5 n. * *, 5 JA 698.

By contrast, Lilly maintained that the policies should be governed by the "multi-ple trigger" theory: the injury should be understood to have "occurred" at any time between exposure to DES and manifestation of symptoms of a DES-related disease.

Lilly filed a declaratory judgment action in the District Court in March 1982. After extensive discovery, Lilly filed a motion for summary judgment in March 1983. Purporting to rely on Indiana law, the District Court granted Lilly's motion on April 12, 1984. The court held that (1) each insurer on the risk between the initial ingestion of DES and the manifestation of a DES-related disease is liable to Lilly for indemnification, (2) each insurer is liable in full once coverage under its policy is triggered, (3) Lilly can apply only one policy's limit to each injury, and (4) Lilly may select the policy under which it is to be indemnified (subject to the provisions in the policies governing allocation of liability when more than one policy covers an injury). *See* Mem.Op. at 22–23, 5 JA 715–716. The insurers appealed.

### B. *The Initial Appeal to This Court*

On appeal the insurers argued that under Indiana law they should be allowed to introduce extrinsic evidence of the parties' actual intent in adopting the policies, their course of conduct in applying the policies, Lilly's sophistication and strength as a bargaining partner, and the etiology of DES-related illnesses. The insurance companies therefore argued that summary judgment had been improvidently granted because there were genuine factual disputes on three material issues: (1) the authorship of the policies, (2) the actual intent of the parties on the question of multiple trigger liability, and (3) the views of medical experts on when injury actually "occurs."

In reviewing these challenges this court agreed with the District Court that the law

---

**4.** Lilly manufactured DES from 1947 to 1967. Over 600 lawsuits have been filed against Lilly for DES-related illnesses.

**5.** There are four basic variants on the policy provision triggering liability. One of them refers to injuries "sustained" during the policy period. 2 Joint Appendix (JA) 97. The other three refer to injuries that "occur" during the policy period. 2 JA 96, 98, 99–100. As noted in *Eli Lilly I,* the parties do not contend that these differences require different interpretations. 764 F.2d at 879.

of Indiana governs the case. A review of Indiana cases, however, suggested that the law of that state was unsettled on the question whether extrinsic evidence is admissible to construe an ambiguous trigger provision in an insurance contract and on the issue of which interpretation a court should adopt if it did not admit such extrinsic evidence. Consequently, in an opinion issued June 18, 1985 a divided panel of this court (Wright, Tamm,[6] and Wald) certified three questions of law to the Indiana Supreme Court.[7]

## C. The Indiana Decision

On September 12, 1985 the Supreme Court of Indiana issued its opinion responding to this court's certification. A petition for rehearing was denied on November 19, 1985, and the case was remanded to this court.

The Indiana court answered two of the three questions certified by this court. First, the Indiana court held that it would not consider extrinsic evidence to determine the meaning of the trigger provisions of Lilly's insurance.[8] The court grounded this rule against admitting extrinsic evidence on two alternative rationales. First, the court cited the policy of construing ambiguous policy language against the insurer. It hinted that this interpretive policy rested, in part, on the more general rule

that construction should favor the non-drafter. 482 N.E.2d at 470. But the court also relied on the policy of construing ambiguous language in this manner because it "further[s] the policy's basic purpose of indemnity." *Id.* Finally, the Indiana court *partially* justified the policy of promoting indemnity on the basis of its tendency to conform with the "reasonable expectations" of the insured. *Id.*

The Indiana court also held that, given the trigger provisions involved in this litigation, the policies' "coverage is triggered at any point between ingestion of DES and the manifestation of a DES-related disease." *Id.* at 471 (the "multiple trigger" theory). The rationale for this rule was the same as the rationale for exclusion of extrinsic evidence: to further insurance policies' "dominant" purpose of providing indemnification. *See id.*

The only limitation the Indiana court imposed on the multiple trigger thesis was that the insurance policy must first be found to be "ambiguous" before its special rules of construction will apply. *Id.* at 470. The court, however, specifically held the language of the policies covering Eli Lilly to be ambiguous.

Broadly stated, the insurers make three arguments as to why the Indiana opinion does not require this court to affirm the judgment of the District Court. First, ap-

**6.** Judge Tamm would have applied this circuit's holding in *Keene Corp. v. Ins. Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Consequently, he opposed certification to the Indiana Supreme Court and filed a dissent.

**7.** The three questions were:

1. Under Indiana insurance contract law, should the types of extrinsic evidence proffered by the insurers be considered in the interpretation of the disputed "trigger" provisions?

2. If any aspect of the insurers' extrinsic evidence should be considered, would Indiana courts require a determination of the parties' actual intent concerning the application of the "trigger" provision to delayed manifestation injuries? Or would Indiana courts permit a determination, after consideration of the extrinsic evidence, that the parties did not hold or convey a clear understanding of the trigger provision's

applicability to delayed manifestation injuries and that, thus, the provision must be interpreted by the court as a matter of Indiana insurance law?

3. If the insurers' extrinsic evidence should not be considered, or if that evidence is not determinative of the parties' intent, how should the insurance policy provision at issue be interpreted under Indiana law? In other words, would Indiana courts adopt an exposure, a manifestation, a multiple trigger, or some other interpretation of the "injury"/"occurrence" language in Eli Lilly's policies?
*Eli Lilly I,* 764 F.2d at 884–885.

**8.** Having thereby answered this court's first question in this manner, the Indiana court saw no need to answer the second (*i.e.,* assuming that *some* extrinsic evidence was introduced, would Indiana courts require a determination of the parties' actual intent concerning the trigger provisions of the policies?).

pellants argue that, notwithstanding its seemingly clear holding, evidence of authorship, actual intent, and etiology is still admissible under the Indiana opinion. Second, and in the alternative, the insurers argue that if Indiana has established a rule of substantive law excluding evidence of authorship, intent, and etiology, the law is unconstitutional. Finally, a handful of the insurers argue that the District Court lacked personal jurisdiction over them and that venue was not proper in the Dnstrict of Columbia. We address these arguments *seriatim.*

## II. ADMISSIBILITY OF EXTRINSIC EVIDENCE

### A. *Admissibility of Evidence of Authorship*

 Appellants contend that the Indiana court made evidence of authorship a material issue in construing insurance contracts. They read the Indiana opinion to make the insurer's authorship of a policy a necessary predicate of the general rule that ambiguities in such policies are to be construed against the insurer and, by implication, a necessary predicate of the court's conclusion that the multiple trigger interpretation should be applied here.

Appellants further argue that, although the Indiana court could determine the substantive law and thereby define the material issues in this case, that court could not determine what evidence was relevant to that issue. Issues of relevance, appellants correctly note, are to be determined under the Federal Rules of Evidence. Appellants therefore conclude that this court can and must ignore the Indiana court's statement that the insurers' evidence of authorship would be excluded under Indiana law. That ruling, they argue, is a gratuitous statement of the Indiana law of evidence. Because appellants introduced evidence of

Lilly's participation in drafting the trigger provision of at least some of the policies, they argue that summary judgment should not have been granted.[9]

The short answer to appellants' contentions is that the Indiana court did *not* make authorship a predicate of the general rules controlling the construction of insurance contracts or of its holdings in this case. As already noted, we read the Indiana court to have based the general rule that insurance contracts are to be construed against the insurer on three policies: assuring indemnification, fulfilling the reasonable expectations of the insured, and *contra proferentem.* 482 N.E.2d at 470. It is true that the rule that insurance contracts should be construed against the insurer is a predicate for the Indiana court's two holdings. And it is also true that the third rationale underlying this rule of interpretation—*contra proferentem*—does turn on authorship. Nonetheless, the Indiana opinion does not suggest that *each* of these rationales is a necessary predicate of the rule that a court should construe ambiguities against the insurer. The Indiana court's passing reference to the issue of authorship is therefore mere dicta.

### B. *Admissibility of Evidence of Actual Expectations*

██ As with the Indiana court's reference to authorship, its statements concerning "expectations" merely elucidate one of the several policies underlying its holdings. As such, these statements are mere dicta. Moreover, the "expectations" of which the Indiana court speaks are the *objectively* reasonable expectations of an insured. The Indiana opinion speaks of expectations that an insured "could" have had, not of the expectations it had in fact. *See id.*[10]

---

9. The insurers argue that Lilly shared in the drafting and was responsible for the wording of several important policy provisions. *See* Joint Post-Certification Supplemental Memorandum of Defendants-Appellants filed Nov. 27, 1985 at 18. Lilly responds by arguing that, although it may have bargained for certain policy changes, it did not bargain in any substantive fashion over the terms of the trigger provision at issue

in this case. *See* appellee's Post-Certification Supplemental Memorandum filed Dec. 10, 1985 at 16 n. 1.

10. The Indiana court adverted to such "reasonable expectations" by citing this court's opinion in *Keene Corp. v. Ins. Co. of North America, supra* note 6. In the passage in *Keene* cited by the Indiana court, this court defined "reason-

It is also notable that the Indiana court referred to the principle of "reasonable expectations" in the context of explaining why it was going to construe insurance contracts against the insurer, as well as in the course of stating its rationale for adoption of the multiple trigger thesis. Thus, contrary to the contention of appellants, *see* Joint Post-Certification Supplemental Memorandum of Defendants-Appellants filed November 27, 1985 at 16, the Indiana court apparently did not think extrinsic evidence should be used to determine the character of such "reasonable expectations." Instead the court seemed to have determined the content of such expectations—the multiple trigger thesis—as a matter of law.[11]

## C. *Admissibility of Evidence of Etiology*

■ The insurers argue that the Indiana court held that liability is triggered if diagnosable "injury" occurs at any point between ingestion and manifestation. They therefore argue that they had a right to introduce relevant evidence on the issue of when injury occurred.

Appellants flatly misread the Indiana opinion. The Indiana court said that "*coverage* is triggered at any point between ingestion of DES and the manifestation of a DES-related disease." 482 N.E.2d at 471 (emphasis added). There is no requirement that diagnosable "injury" be shown during the time the insurer is on the risk.[12]

Appellants argue that when the Indiana court stated that "the determinative ques-

tion * * * [is] when the DES-related 'injury' 'occurs' for purposes of the policies[,]" 482 N.E.2d at 469–470, it made the existence *vel non* of actual injury a material question in construing the trigger provision. Appellants fail to grasp the importance of the quotation marks around the terms "injury" and "occurs" in the Indiana court's formulation of the issue. By inserting the quotation marks the Indiana court plainly sought to signal that it understood those words to be terms of art that might well have a somewhat artificial legal meaning. If the Indiana court's phrasing of the "determinative question" is read in this manner, there is nothing surprising about its answer: coverage is triggered from the time of ingestion to the time of manifestation.

■ In sum, the only factual predicate of the rule that insurance contracts should be construed against the insurer is the requirement that the contract be ambiguous. Once that factual predicate was satisfied no quantum of evidence on the issues of authorship, intent, or etiology should have defeated a motion for summary judgment.

## III. WAIVER OF CONSTITUTIONAL OBJECTIONS TO THE INDIANA OPINION

■ Appellee challenges appellants' efforts to attack the constitutionality of the Indiana opinion at this stage of the proceedings. Appellee argues that these arguments should have been presented in appellants' memoranda opposing appellee's motion for summary judgment in the Dis-

---

able expectations" as those expectations that the insured "could have reasonably formed, as an *objective* matter, on the basis of the policies' language." 667 F.2d at 1042 n. 12 (emphasis added).

11. Thus in the hands of the Indiana court the concept of "objectively reasonable expectations" becomes a way of emphasizing one aspect of the policy of furthering indemnification: its assurance of certainty for the insured. Although this concept is susceptible of a variety of meanings, *see* Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 HARV.L.REV. 961 (1970), the Indiana court's view is not an irrational application of that idea. Indeed, Professor (now Judge) Keeton has suggested that cer-

tain situation-specific evidence of actual intent or knowledge must be disregarded in construing the "objective" intentions of the insured. *See id.* at 967, 974–975.

12. Ironically, the insurers seek to transform the Indiana opinion from an adoption of the *Keene* multiple trigger rule into the "injury in fact" view of *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y. 1983), *aff'd as modified*, 748 F.2d 760 (2d Cir. 1984). This court, however, certified this case to the Indiana court partially because it sought to clarify Indiana's view of the multiple trigger, injury in fact, manifestation, and exposure theories of liability.

trict Court. Appellants contend that these issues were not ripe for resolution until the Indiana court provided a definitive statement of Indiana law. We do not find appellants' argument persuasive and hold that they waived their right to challenge the constitutionality of the Indiana opinion.

Once the District Court rendered its decision,[13] a constitutional attack on its construction of Indiana law was ripe for review. In its memorandum opinion granting appellee's motion for summary judgment the District Court determined that the law of Indiana governed this case. *See* Mem.Op. at 15, 5 JA 708. It also held that an Indiana court would not admit extrinsic evidence to construe this sort of ambiguous insurance contract, *see id.* at 20, 5 JA 713, and that an Indiana court would apply the *Keene* rule. *See id.* at 22, 5 JA 715. Thus all of the legal rulings that appellants find to be constitutionally offensive were stated with some precision in the District Court's memorandum opinion.

Appellants, however, failed to raise their constitutional arguments in their appeal to this court. *See* Joint Brief of Defendants-Appellants filed October 30, 1984. Nor did they bring these issues to the attention of the Indiana court before it rendered its decision. Instead, appellants raised their constitutional arguments for the first time in their petition for rehearing to the Indiana Supreme Court.[14]

The rule in this circuit is that litigants must raise their claims on their initial appeal and not in subsequent hearings following a remand. *Laffey v. Northwest Air-*

*lines, Inc.,* 740 F.2d 1071, 1089–1092 (D.C. Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985). This is a specific application of the general waiver rule, which bends only in "exceptional circumstances, where injustice might otherwise result." *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1085 (D.C.Cir. 1984). There are no such circumstances in this case, and we see no need to create a blanket exception to the rule in *Laffey* and *Air Florida* for certification proceedings. We therefore find that appellants waived their constitutional claims by failing to raise them on their initial appeal to this court.

### IV. PERSONAL JURISDICTION AND VENUE

Three of the appellant insurance companies contend that the District Court lacked personal jurisdiction over them and that venue in the District of Columbia was improper.[15] These appellants are all "excess" insurers: they provide supplemental coverage under roughly the same terms as Lilly's primary insurers. Appellee contends that these appellants effectively waived such personal jurisdiction and venue objections through consent to suit clauses in their insurance policies. Alternatively, appellee argues that jurisdiction and venue were properly exercised under the applicable statutes and the Due Process Clause. We examine these arguments *seriatim.*

### A. The Consent To Suit Clause

All three of these carriers [16] are bound by the following contractual provision:

---

**13.** Although Lilly's arguments in the District Court did foreshadow that court's ultimate basis of decision, *see* Statement of Points and Authorities in Support of Plaintiff Eli Lilly's Motion for Summary Judgment filed March 31, 1983, 2 JA 37–42, and although appellants failed to attack the constitutionality of such a course in the District Court, *see* Statement of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment filed May 31, 1983, 2 JA 683, 748–751; Joint Supplemental Memorandum of Defendants in Opposition to Plaintiff's Motion for Summary Judgment filed Aug. 31, 1983, 4 JA 108, appellants could reasonably have thought a constitutional challenge to the implications of Lilly's thesis would be prema-

ture until there was a legal ruling focusing the issues.

**14.** *See* Joint Post-Certification Supplemental Memorandum of Defendants-Appellants, *supra* note 9, at 42.

**15.** The three are Falcon Insurance Company, Interstate Indemnity Company, and Mutual Fire, Marine & Inland Insurance Company.

**16.** Interstate and Falcon are bound through the provision in their policies that makes them subject to the terms of the primary insurer's policy. Mutual's policy contains its own consent to suit clause that is identical to the provision reproduced in text.

It is agreed that in the event of the failure of the Insurer(s) hereon to pay any amount claimed to be due hereunder, Insurer(s) hereon, at the request of the Insured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Mutual Fire Cover Note, CN 500528, 2 JA 670. *See also* 1 JA 183 (finding of the District Court that the consent to suit clause was adopted by reference by appellants Falcon and Interstate).

■ Appellants raise two arguments as to why this consent to suit clause does not eradicate their jurisdiction and venue objections. First, they argue that a court of "competent" jurisdiction must be a court that has *in personam* jurisdiction as well as subject matter jurisdiction. This argument largely reduces the consent to suit clause to a waiver of venue or *forum non conveniens.* As an initial matter, we find this reading hypertechnical, given that in many jurisdictions it is difficult to distinguish the outer perimeter of venue and *in personam* jurisdiction.[17] Moreover, by its terms the clause requires the insured to do what is necessary to "give such Court jurisdiction." Although it is hardly clear just what that phrase means, it is certain that it does *not* refer to the collusive creation of subject matter jurisdiction. It therefore presumably refers to *in personam* jurisdiction and constitutes an implicit promise to consent to the exercise of such jurisdiction.

On the other hand, it would seem that if the term "competent" in the consent to suit clause is reduced to consent to subject matter jurisdiction, that term would be mere surplusage. Because parties could never "consent" to suit by a court that *lacked* subject matter jurisdiction, it must be assumed that *any* consent to suit would implicitly constitute consent to suit in a court that had subject matter jurisdiction. Under this reading the term "competent" would only be added to the consent to suit clause if the parties felt a need to specify that they had only consented to suit in courts that were already able to exercise personal jurisdiction over them.

Accepting that the term "competent jurisdiction" may be ambiguous in this context, we must construe that term in accordance with Indiana law. As already noted, the general rule of construction in Indiana is that ambiguous terms in insurance contracts are to be construed against the insurer. Under this rule it would seem that the contractual waiver of jurisdictional objections should be read broadly to include waiver of personal jurisdiction as well as a waiver of any venue objections.[18]

■ Appellants' second argument is that this provision is only operative after presentation of a claim by the insured to an insurer and a default by the insurer on its obligations to the insured. Appellants' obligations as excess insurers are not triggered until the primary policy limits have been exhausted. Because the primary insurers have failed to honor Lilly's claims during the pendency of this litigation, the excess insurers assert that they have not yet had occasion to default on their obligations and therefore that a condition

---

**17.** *Compare Du-Al Corp. v. Rudolph Beaver, Inc.,* 540 F.2d 1230, 1233 (4th Cir.1976) (implicitly equating the two tests); *Houston Fearless Corp. v. Teter,* 318 F.2d 822, 826 (10th Cir.1963) (expressly equating the two tests), *with Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 743 F.2d 947, 954 (1st Cir.1984) (finding that the outer limits of the "doing business" provision of the federal venue statute are defined by the dormant Commerce Clause, not the Due Process Clause). *See also* 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDIC-

TION § 3811 at 117–130 (1986) (criticizing the Commerce Clause test).

**18.** We also note that the Indiana rule, announced in *Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind.1985), that extrinsic evidence of actual intent is inadmissible applies to this issue. Therefore we have no occasion to remand the case for factual findings by the District Court on the parties' actual intent concerning the scope of the consent to suit clause.

precedent of their consent to suit has yet to be fulfilled.

Appellant Interstate, however, failed to raise the question of the condition precedent during the proceedings before the District Court.[19] It cannot raise it here at this late date. *See District of Columbia v. Air Florida, Inc., supra,* 750 F.2d at 1084–1085. We therefore find the consent to suit clause fully operative as to appellant Interstate and affirm the District Court's order denying its motion to dismiss appellee's complaint for want of personal jurisdiction or venue.

Appellants Falcon and Mutual, however, did raise the issue of the condition precedent before the District Court.[20] Appellee argues that under the law of Indiana conditions precedent are waived by an "anticipatory breach," *i.e.,* by an insurer's repudiation of its liability under the policy. This is a correct statement of Indiana law. *See McNall v. Farmers Insurance Group,* 181

Ind.App. 501, 392 N.E.2d 520, 523 (Ind. 1979); *Ohio Farmers Ins. Co. v. Vogel,* 166 Ind. 239, 76 N.E. 977, 978 (1906).[21] Unfortunately, the law of Indiana does not appear to define the term "anticipatory breach" with precision. Nor does it indicate whether anticipatory repudiation will waive *all* conditions precedent or only those conditions that remain in effect after the innocent party has substantially performed. But whatever the rule in Indiana, it appears that there was a failure of the condition precedent in the consent to suit clause as to appellant Mutual.

Prior to the District Court's ruling on the question of personal jurisdiction, Mutual had failed to take a specific position on the trigger provision of its policies.[22] Thus as to Mutual it is clear that there was no repudiation of liability. Although this may have generated some uncertainty for appellee Lilly, we cannot find that such uncertainty was enough to nullify a bargained-for condition precedent.

19. Interstate failed to raise the issue in its arguments during the pendency of its motion to dismiss, *see* Memorandum of Law in Support of Motion to Dismiss by Defendant Interstate Indemnity Company, 1 JA 122–128; Reply of Interstate Indemnity Company to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, 1 JA 172–179. It is true that in its subsequent Answer to appellee's Complaint for Declaratory Judgment appellant Interstate did aver "a failure of conditions precedent to insurance *coverage* * * *." (Emphasis added.) This statement, listed as Interstate's "Seventh Defense," was not linked to Interstate's jurisdiction and venue objections (its "Fourth Defense"). If this general reference to "conditions precedent" was intended to amend the rather detailed arguments raised by Interstate on the jurisdictional issue, Interstate should have expressed this point with greater specificity.

20. *See* Reply to Plaintiff's Opposition to Motions to Dismiss by Defendants Mutual Fire, Marine & Inland Insurance Company and Falcon Insurance Company at 4–6 (July 26, 1982).

21. Appellants rely on dicta in *China Union Lines v. American Marine Underwriters, Inc.,* 458 F.Supp. 132, 136 (S.D.N.Y.1978), to the effect that a consent to suit clause is only triggered upon an actual default, not upon a mere anticipatory breach. The issue in *China Union* was whether a consent to suit clause constituted a waiver of an arbitration clause in the same

contract. The court stated that it was not inclined to read the consent to suit clause as a waiver of the arbitration clause, in light of the strong federal policy favoring arbitration. *See* 9 U.S.C. § 4 (1982). Thus, although the *China Union* opinion does contain broad dicta on the inadequacy of an anticipatory breach to trigger a consent to suit clause, such dicta is best read in light of the court's concern to accommodate a particular federal policy, a policy that is not applicable to this case. Moreover, the *China Union* court did not purport to construe the law of Indiana, the law that controls our construction of the insurance policy at hand and requires us to apply the rule that an anticipatory breach waives conditions precedent.

22. *See* Defendant Mutual Fire, Marine & Inland Insurance Company's Response to Plaintiff's Third Set of Interrogatories, Answers to Interrogatories Nos. 27–29 (June 2, 1983). Mutual merely stated that its interpretation "differs from that advanced by Lilly * * *." Given the variety of interpretive theories attending such contracts, the mere fact that an insurer might dispute the view of the insured would not, without more, automatically lead to the conclusion that *the insurer had repudiated its obligations.* Mutual may simply be maintaining a consistent litigation position here, knowing that it would ultimately have to pay Lilly, because it was intent on disputing its liabilities under similar trigger provisions included in other policies.

Appellant Falcon presents a harder case. Unlike Mutual, Falcon had adopted a specific view of the trigger clause: the manifestation theory.[23] Falcon issued policies to Lilly from 1960 to 1968. Lilly may still be seeking indemnification for claims based on illnesses that first became manifest before 1968, during the time Falcon would be liable to Lilly even under a manifestation theory. Thus on the facts before us it is simply not possible to determine whether Lilly might only present Falcon, as its excess insurer, with a set of claims that qualified under the manifestation theory.[24]

Ordinarily we would remand this issue for further determinations by the District Court. But given the clear failure of the condition precedent as to appellant Mutual's consent to suit we must, in any event, reach the issue of whether due process allowed the District Court to exercise personal jurisdiction under the District of Columbia long arm statute. Because we find that personal jurisdiction was properly exercised under that statute, we find no need to consume additional judicial resources through a remand.

B. *D.C. Long Arm Statute and Due Process*

The D.C. long arm statute, 13 D.C.Code § 423(a)(3) (1981 & 1985 Supp.), provides for jurisdiction over any person who contracts to insure any "risk * * * within the District of Columbia at the time of contracting." Appellee contends that the risk against which it insured here was the risk of liability arising from the use of its products, and that this risk existed wherever its products were used, including the District of Columbia. *See* supplemental brief of appellee filed December 13, 1984 at 15. We find appellee's reading of the D.C. long arm statute to be natural and persuasive. Although we must apply the D.C. long arm statute in this case, *see Gatewood v. Fiat, S.p.A.,* 617 F.2d 820, 822 n. 3 (D.C.Cir.1980), we can only apply that statute in a manner consistent with the Due Process Clause. *See Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 743 F.2d 947, 950 (1st Cir.1984).

The touchstone of our due process inquiry is whether it would have been "foreseeable" that the excess insurers would be "haled into court" in the District of Columbia. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Given the specific relationship between appellants and appellee in this case, we have little difficulty finding that such a result was in fact quite foreseeable.

Appellants knew that their insured, Lilly, distributed its products nationwide. They therefore were aware that *Lilly* was likely to be sued in any jurisdiction in the nation, including the District of Columbia. Moreover, as Lilly's insurers, appellants were aware that if Lilly was sued it was likely to attempt to implead appellants if a dispute arose over their duty to indemnify or defend. *Cf., e.g., Porter v. American Optical Corp.,* 641 F.2d 1128, 1131 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (asbestos manufacturer's insurers named as third-party defendants in products liability suit). In such an eventuality it would be completely foreseeable that the insured would successfully hale the insurance company into court.

The likelihood of impleader actions is not the sole reason for considering the contacts of the insured with a forum state in determining the foreseeability of an insurer be-

---

**23.** *See* Defendant Falcon Insurance Company's Response to Plaintiff's Third Set of Interrogatories, Answer to Interrogatories Nos. 27–29 (June 2, 1983).

**24.** We do not suggest that it is impossible or even unlikely that Falcon's position did effectively amount to a repudiation; we are simply unwilling to take that step absent more elaborate findings by the District Court on the likely effect of this position on Falcon's obligations. Although the District Court did find that the insurers had taken a position that "generally" would minimize their liability, *see* Mem.Op. at 5 n. * *, 5 JA 698, such a broad finding does not speak to the narrow question whether Falcon's adoption of the manifestation theory would necessarily have resulted in a repudiation of its obligations in this case.

ing haled into court in that jurisdiction. Insurers must carefully gauge the riskiness of the products they insure. In determining the scope of the risk they have insured, insurers must consider the scale on which its insured has distributed a potentially dangerous product. The broader the distribution the greater the risk—and presumably the higher the premium. Thus insurers cannot be said to have failed to avail themselves, in a conscious and deliberate manner, of the benefits of doing business in those fora in which the insured manufacturer distributes its products. Moreover, an insurer has a commercial interest in knowing how, and to what degree, an insured manufacturer has contacts with a forum state.

The commercial interest of the insurer in knowing of the contacts of its insured with the forum state provides the rationale for the First Circuit's rule that an insurer should foresee being sued in a jurisdiction where its insured has substantial contacts. Thus in *American & Foreign Ins. Ass'n v. Commercial Ins. Co.*, 575 F.2d 980, 982 (1st Cir.1978), the court found that a products liability insurer was subject to personal jurisdiction where (1) the insured had shipped its products into the forum state, and (2) the terms of the policy "assured full knowledge of both the volume of export sales [and] the actual location of the customers." In *Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni*, 628 F.2d 652, 669 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981), the First Circuit indicated that the lack of

an *explicit* understanding between the insurer and insured indicating that the insurer knew of the insured's contact with the forum state did not bar the exercise of *in personam* jurisdiction where the insurer plainly knew that the insured was likely to have substantial contacts with the forum. In this case there can be no question but that Eli Lilly's insurers were aware of the nation-wide scope of Lilly's product distribution. They cannot now claim that it was somehow unforeseeable that they would be haled into court in a jurisdiction where Lilly would likely be subject to suit.[25]

### C. Venue

Under 28 U.S.C. § 1391(c) (1982) venue is proper in any forum state where a corporation is "doing business." In *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 760 F.2d 312 (D.C.Cir. 1985), this court adopted this construction of the doing business test:

> "[D]oing business" in a district for the purposes of § 1391(c) [should be] read to mean engaging in transactions there to such an extent and of such a nature that the state in which the district is located *could* require the foreign corporation to qualify to "do business" there.

*Id.* at 316 n. 7 (*quoting Johnson Creative Arts, supra*, 743 F.2d at 954) (brackets & emphasis in original)).

Consistent with this view, a corporation is "doing business" under Section 1391(c) whenever the Constitution would permit a state to require a foreign corporation to

---

**25.** Appellants' situation is therefore distinguishable from that of the manufacturer in *Hughes v. A.H. Robins Co.*, 490 A.2d 1140, 1150–1151 (D.C. C.A.1985). In that case the District of Columbia Court of Appeals found that due process was not satisfied where the manufacturer had only done substantial business within the forum on an intermittent basis and the cause of action did not arise from such contacts within the forum. *See also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–415, 104 S.Ct. 1868, 1872–1873, 80 L.Ed.2d 404 (1984). Here the "contacts" of the insurers are much more substantial because they include the decision to insure a manufacturer that distributed products

in the forum state. Even in non-insurance cases the activities of various middlemen may be relevant to an evaluation of the contacts of the defendant with the forum state. *See, e.g., Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315, 1318 (5th Cir.1970) (court could exercise personal jurisdiction over third-party defendant manufacturer where manufacturer sold products to Sears with knowledge that Sears would ship a substantial number to forum state). It is particularly appropriate, however, when evaluating the contacts of a products liability insurer with the forum state to consider its relationship with its insured and the insured's contacts with the forum state.

comply with a licensing scheme. *See Johnson Creative Arts, supra,* 743 F.2d at 954.

Appellants Mutual and Falcon both allocated premiums to policies sold in the District of Columbia.[26] Such policies were sold by independent brokers; neither appellant maintained an office in the District or had employees in the District. It is clear that the District of Columbia *could* impose such a burden on foreign excess insurers before independent brokers could sell their policies. Such practices are common in other jurisdictions without being upset by constitutional challenge.[27] *See, e.g.,* Md.Code Ann. Art. 48A, § 190 (1979 & 1985 Supp.). *See also* Schwing, *A Comparative Analysis of the Qualification Requirements Applicable to Alien Stock Insurers, to Surplus Line Insurers, and to Reinsurers,* INS.L.J. 649, 674–678 (November 1976). Thus it would seem that under the *Noxell/Johnson* test venue was proper in the District of Columbia.

## V. CONCLUSION

Authorship, intent, and etiology are not material issues under Indiana law, and evidence bearing on such issues was rightly excluded. As the District Court held, any insurer on the risk between the time of ingestion and the manifestation of symptoms has a duty to indemnify appellee. The District Court's grant of appellee's motion for summary judgment is therefore affirmed. We also find the appellant excess insurers' personal jurisdiction and venue arguments to be ultimately unpersuasive. We therefore also affirm the District Court's order denying these appellants' motion to dismiss.

*Affirmed.*

**26.** *See* Affidavit of Paul D. Dooley (June 14, 1982) (for appellant Mutual), 1 JA 116–117; Affidavit of Ross C. Cowan (June 14, 1982) (for appellant Falcon), 1 JA 118–120. The record does not reveal any similar business contacts by appellant Interstate. But because we find that the consent to suit clause was fully operative against Interstate, we hold that Interstate effectively waived its venue objections as well as its personal jurisdiction objections.

**27.** Indeed, the Supreme Court has read the passage of the McCarran-Ferguson Act, 59 STAT. 33, 15 U.S.C. § 1011 (1982), as a removal of all dormant Commerce Clause limitations on the power of the states to regulate insurance. *Western & Southern Life Ins. Co. v. State Board of Equalization,* 451 U.S. 648, 653–655, 101 S.Ct. 2070, 2075–2076, 68 L.Ed.2d 514 (1981).