**CSR LIMITED and CSR America, Inc., Plaintiffs**

v.

**FÉDERAL INSURANCE COMPANY, et al., Defendants**

**No. CIV.A. 95–2947(HAA).**

United States District Court, D. New Jersey.

May 25, 2001.

McElroy, Deutsch & Mulvaney (KC 8550), Morristown, NJ, for Defendants Listed on Schedule A.

Gita Rothschild, McCarter & English, Newark, NJ, for Plaintiff.

John Dixon, Sullivan & Cromwell, New York City, for Plaintiff.

Joseph R. McDonough, (JRM7129), Graham, Curtin & Sheridan, Morristown, Paul R. Koepff, (PRK8452), Rosemary B. Boller, (RBB6876), O'Melveny & Myers LLP,

New York City, for Defendants CIGNA Insurance Company of Europe S.A.-N.V. CIGNA Insurance Asia Pacific Limited Insurance Company of North America (U.K.) Limited.

Amended Opinion

ACKERMAN, District Judge.

This matter comes before the court on a motion by certain defendants [1] ("defendants") for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of *in personum* jurisdiction and on a motion by defendants for dismissal on the grounds of *forum non conveniens.* The plaintiffs, CSR Limited and CSR America, Inc., ("plaintiffs") have opposed the motions. For reasons stated below, the motion to dismiss for lack of *in personum* jurisdiction and the motion to dismiss on the grounds of *forum non conveniens* are DENIED.

## I. Background

CSR Limited is a publically traded company, established in 1887 under the laws of New South Wales, Australia, with its principal place of business in Sydney, Australia. From 1943 to 1966 CSR acted as a sales agent for one of its subsidiaries, Midalco Pty. Limited, in connection with the sale of raw blue asbestos fiber mined at Midalco's operation in Wittenoom, Western Australia. CSR America, Inc. is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in West Palm Springs, Florida. It is a wholly owned subsidiary of CSR Investments Overseas Limited which, in turn, is a wholly owned subsidiary of CSR, Limited. The moving defendants are insurance companies, primarily located in Australia and Europe, that allegedly issued primary, umbrella and excess policies of insurance to CSR Limited from 1978 to 1995. CIGNA Insurance Australia Limited ("CIGNA Australia") was the lead primary layer insurer and also a lead insurer on many of the umbrella and excess insurance layers. Many of the insurer policies issued to CSR contain a "lead insurer" clause in the following or similar terms:

> It is declared and agreed that with effect from inception all Extension, Reductions or Cancellations of Risk or of Conditions, all Fixings of Premium, all Settlements of Claims or Contestations whatsoever and in general all Dispositions of whatsoever nature, taken by the Lead Insurer will definitely be binding upon all insurers and carry with them the unanimous consent of all Insurers under this Contract.

*See* Defendant's Brief in Support of Motion to Dismiss on the Grounds of Forum Non Conveniens at 5.

Thousands of asbestos claims have been filed against CSR and CSR America as a result of CSR's export activities. As of August 1994, CSR had settled 447 Australian personal injury claims, and as of 1995, CSR and CSR America had settled 40,000 U.S. personal injury claims. Cases settled by CSR include *Smith, et. al. v. Johns–Manville, et. al. and Consolidated Cases,* Civ. Nos., 77–2047, 79–9, 79–1992, 79–2680, 79–2218, 79–3056, 80–179, 80–264 (D.N.J.) (Ackerman, J.). To date, CSR and CSR America have settled approximately 109,-000 U.S. asbestos bodily injury claims, most of which related to finished products

---

1. *See* Notice of Motion to Dismiss for Lack of Personal Jurisdiction, Schedule A, and Notice of Motion and Joinder in the Motion to Dismiss the First Complaint for Lack of Personal Jurisdiction; *see also* Notice of Motion to Dismiss on the Grounds of Forum Non Conveniens, Schedule A and Notice of Motion and Joinder in the Motion to Dismiss on the Grounds of Forum Non Conveniens, attached to this opinion as Appendix 'A'.

manufactured in the John Manville plant in New Jersey.

On November 29, 1991, CSR wrote to its insurers formally requesting coverage for U.S. asbestos-related claims asserted to that date. The insurers rejected the claim, and required that, before re-insuring CSR for the 1992–93 year, CSR sign a letter agreeing to withdraw its asbestos coverage claims. CSR signed the letter and subsequently obtained coverage.

CSR has since litigated the enforceability of the letter and sought reimbursement for the claims filed against it. It pursued litigation in Australia against pre–1978 insurers, and in the midst of that litigation, it filed suit against certain pre–1978 insurers in New Jersey to relieve itself of transcontinental discovery burdens related to the U.S. claims; however, the Australian court stayed the New Jersey action.

On June 23, 1995, after settlement of the pre–1978 claims, CSR and CSR America instituted this suit in the United States against its post–1978 insurers for payment of claims brought in the United States against CSR and CSR America. The plaintiffs' complaint alleged, inter alia, breach of contract, bad faith denial of coverage, tortious interference with contractual relations, tortious interference with prospective economic advantage, violation of section 1 of the Sherman Antitrust Act, and violation of title 56, section 9–3 of the New Jersey Statutes Annotated. Plaintiffs' antitrust claim is based on their allegation that defendant insurers engaged in a group boycott when the insurers collectively refused to write plaintiffs a new insurance policy unless plaintiffs withdrew a request for coverage of 95,000 asbestos-related claims which plaintiffs contend were covered under a previous policy written by the defendants.

This court will first address the defendants' motion for dismissal for lack of *in personum* jurisdiction and then address defendants' motion for dismissal on the grounds of *forum non conveniens.*

## II. Personal Jurisdiction

### A. Standard

A court may only exercise personal jurisdiction over a defendant in a state with which the defendant has "Certain minimum contacts ... such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), (*quoting Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

If the cause of action related directly to the defendant's contacts with the forum state, it is one of "specific jurisdiction." Such jurisdiction depends on whether a defendant "purposely created contacts" with the forum state making it reasonable for him to anticipate being haled into court there. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); These contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Where the cause of action does not arise within the forum, the plaintiff bears the burden of proving that the non-resident defendant had "continuous and systematic" contacts with the forum so as to establish general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Provident Nat'l Bank v. California Federal Sav. & Loan Ass'n,* 819 F.2d 434, 438 (3d Cir.1987).

Federal statutes which contain a nationwide service of process procedure enable a federal court to exercise personal jurisdiction over a properly served defendant "provided the defendant has minimum contacts with the United States." *IUE AFL–CIO Pension Fund v. Locke Mach. Co.,* 726 F.Supp. 561, 565 (D.N.J. 1989). If such contacts with the United States can be established, "specific contacts with the district in which enforcement is sought ... are unnecessary." *Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles,* 87 F.3d 413, 417 (10th Cir.1996). Section 22 of the Clayton Act, 15 U.S.C. § 22 provides for nationwide service of process in all actions under the antitrust laws. Therefore, jurisdiction in this case is determined by defendants' contacts with the United States as a whole.

In evaluating a motion to dismiss for lack of *in personam* jurisdiction, the court "must accept all of the plaintiffs' allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, F.A. v. Shushan,* 954 F.2d 141, 142 n. 1 (3d Cir.1992). Once personal jurisdiction has been challenged, plaintiff must come forward with actual proofs which establish "with reasonable particularity" the nature and extent of the defendant's contacts with the forum state. *See Patterson v. FBI,* 893 F.2d 595, 603–4 (3d Cir.1990).

### B. Application

Defendants contend that they have not created meaningful contacts with New Jersey, on the grounds that they are foreign companies with principal places of business in Australia or Europe, who have not maintained an office or bank account, owned property, paid taxes, solicited business, or employed workers in New Jersey. Allegedly, the policies they issued to CSR do not provide coverage to CSR for liabilities arising from CSR's involvement with asbestos. Therefore, according to the defendants, they have not purposefully created contacts with New Jersey such that they should reasonably anticipate being haled into court here. Defendants further contend that the exercise of jurisdiction over the foreign defendants by a New Jersey court would not comport with traditional notions of fair play and substantial justice.

Plaintiffs respond that because the insurance contracts issued by the defendants contain world-wide coverage clauses, the defendants availed themselves of the benefits of doing business in the forum, and therefore have the required minimum contacts with this forum. Moreover, plaintiffs contend that the vast numbers of New Jersey claims render long arm jurisdiction over defendants fair and just.

### 1. Minimum Contacts

This court first notes that forty-two defendants have stipulated that they have continuous and systematic contacts with New Jersey for purposes of personal jurisdiction in this suit. *See* Stipulation, dated May 5, 1999, Garvey Aff. Exh. 149.

With respect to the remaining defendants, a liability insurer whose policy "territory" covers the forum has "minimum contacts" with that forum, and is constitutionally subject to suit by its insured there in coverage litigation concerning forum-related incidents or claims. *See Eli Lilly and Co. v. Home Ins. Co.,* 794 F.2d 710, 720–21 (D.C.Cir.1986). According to the D.C. Circuit:

In determining the scope of the risk they have insured, insurers must consider the scale on which its insured has distributed a potentially dangerous product. The broader the distribution the greater the risk—and presumably the higher the premium. Thus insurers

cannot be said to have failed to avail themselves, in a conscious and deliberate manner, of the benefits of doing business in those fora in which the insured manufacturer distributes its products. (Citations omitted).

*Eli Lilly,* 794 F.2d at 721; *see also Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.,* 907 F.2d 911, 913 (9th Cir. 1990) ("The record establishes that [the insurer] satisfied the purposeful availment requirement. Its policy coverage extends into Montana and an insured event resulted in litigations there."); *Rossman v. State Farm Mut. Auto. Ins. Co.,* 832 F.2d 282, 287 (4th Cir.1987) (finding that had the insurer wished to avoid suit in Virginia, it should have excluded that state from the policy territory); *New Jersey Auto. Full Ins. Underwriting Ass'n v. Indep. Fire Ins. Co.,* 253 N.J.Super. 75, 600 A.2d 1243, 1245 (Super.Ch. Div.1991) (holding that contractual commitment by non-resident insurance company to defend its insured against claims arising out of accidents occurring in New Jersey constituted sufficient contact with the state to subject the insurance company to suit in New Jersey if an insured has an accident in the state).

At least one court has declined to base general personal jurisdiction solely on a territory of coverage clause. *Travelers Indem. Co. v. Calvert Fire Ins. Co.,* 798 F.2d 826 (5th Cir.1986), *modified in rehearing in unrelated part,* 836 F.2d 850 (5th Cir.1988). Likewise, in *Waste Management Inc. v. Admiral Ins. Co.,* 138 N.J. 106, 128, 649 A.2d 379 (1994), the New Jersey Supreme Court found that "[i]n the absence of a forum-related event, a 'territory of coverage' clause alone does not create a sufficient basis on which to rest jurisdiction in this state." These cases are easily distinguishable from the instant case, however, since the initiation of vast numbers of claims in New Jersey, in conjunction with the territory of coverage clause, links defendants to this forum.

The polices issued to CSR each include worldwide territory of coverage clauses, typically protecting against an "occurrence" such as an "accident or happening or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury ... anywhere in the world," and cover CSR for some portion of the period during which asbestos claims were initiated against CSR. *See* citations in the Appendix submitted in conjunction with Plaintiff's Opposition to Defendant's Motion to Dismiss on the Grounds of *In Personum* Jurisdiction. These policies are standard form primary and excess general liability policies which New Jersey courts and the Third Circuit have found to cover asbestos-related injuries, including injuries which may have be caused by exposure prior to the policy period but manifest themselves during the policy period. *See Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 995 (1994)("[W]e hold that when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy"); *See also ACandS, Inc. v. Aetna Cas. & Sur. Co.,* 764 F.2d 968, 973 (3d. Cir.1985) (finding state law controlling on issue of interpretation of an insurance contract and affirming district court's finding that under Pennsylvania law, bodily injury from asbestos encompasses both exposure and manifestation of injuries). Therefore, although the defendants claim that the policies only covered current exports to the United States, the policies in fact cover injuries from the insured's past exports.

Moreover, the defendants undertook to insure CSR with the knowledge that they risked indemnifying CSR against asbestos claims and factored that risk into the price of the coverage they offered. As a representative of one of the defendant insurers, Commercial Assurance of Australia, noted in a file memorandum "any prudent underwriter in 1983" would have known of CSR's potential liability for asbestos claims. Garvey Affidavit, Ex. 140. The plaintiffs submit evidence that the defendants evaluated the extent of CSR's exposure to asbestos claims. For instance, an October 25, 1978 CIGNA Australia telex, from "Dixon" of INA Philadelphia to "Nelson," advocates writing coverage for CSR "as a business decision" and notes that "Asbestos operation sold." CSR alleges that INA initially sought to include a clause excluding asbestos coverage when it issued the policy, but retracted this requirement because CSR's existing policies contained no such exclusions and CSR would not transfer carriers if it would lose this coverage.

Furthermore, INA was in a better position than "any prudent underwriter" to assess the risks posed by asbestos claims in the United States, as it was "the major insurer" of the Mansville plant. *See* Garvey Affidavit, Ex. 132. According to a memorandum to file assessing CSR's public liability claims, one of I.N.A.'s co-defendants, New Zealand Insurance, understood from its conversations with representatives of I.N.A. that the United States branch of I.N.A. "seem ... confident of success in their defense [against asbestos claims of plant employees]. There are considerable variances in the law in the various States as we are already aware and the position is constantly changing as many states move away from 'strict' liability." This memorandum suggests that the insurers were aware of, or should have been aware of the risk of asbestos litigation and sought to

weigh that risk against the value of the policies. As G.H. Dixon wrote to J.P. Nelson of I.N.A. International in Philadelphia on January 30, 1979:

> I do know that Alan [May] has arranged coinsurance on the ground up coverage and it is unlikely that any loss to us will be of hurtful proportions. I hope you can understand the reasons for the business decision I made on this acceptance because the CSR account does have big premium potential for us in many areas and these days an account of this magnitude is hard to come by.

Garvey Affidavit, Ex. 129. Thus, this court finds that the defendants purposefully availed themselves, "in a conscious and deliberate manner" of the risks and benefits of doing business in this forum. As a result, the defendants have sufficient minimum contacts with this forum to justify the court's exercise of personal jurisdiction over them.

### 2. *Fair Play and Substantial Justice*

■ After the Court has established that defendants have the requisite minimum contacts with a forum, it must then determine whether it would be fair and just to require defendants to litigate in that forum. *Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174. This is particularly true when the Court seeks to exercise jurisdiction over foreign defendants: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). The U.S. Supreme Court has suggested that in making such a determination, the court consider the following:

1) the burden on the defendant; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate justice system's interest in obtaining the most efficient resolution of controversies, and, if relevant, 5) the shared interest of the several states in furthering fundamental substantive social policies.

*Burger King,* 471 U.S. at 477, 105 S.Ct. 2174.

As the Court discusses at greater length below when reviewing defendants' motion to dismiss on the grounds of *forum non conveniens,* while the defendants will be burdened by having to try this case in the United States, New Jersey is by far a more convenient forum for the plaintiffs. Evidence of the negotiations of the policy and its extensions and witnesses thereto are primarily located in Australia; however, evidence of the 109,000 asbestos claims, which defendants have placed in contention in previous asbestos litigation, are located in New Jersey. Moreover, New Jersey has a strong interest in enforcing reimbursement of insurance claims paid to its citizens. Finally, despite the defendants' assertion that any treble damages awarded in this case might be unrecoverable in Australia, such unrecoverability does not render the entire litigation inefficient. That the disposition and recovery of the cost of claims would be recognized in Australia renders U.S. litigation sufficiently effective and efficient, and distinguishes this case from *Eaton Corp. v. Maslym Holding Co.,* 929 F.Supp. 792 (D.N.J.1996), in which the district court found that adjudication of a dispute involving a Swiss party would be inefficient because the U.S. court's judgment would not be recognized or enforced in Switzerland.

Therefore, considerations of fair play and substantial justice weigh in favor of granting jurisdiction to the plaintiffs in the present case. This court thus finds that it has specific jurisdiction over the defendants and declines to dismiss this case for lack of personal jurisdiction.

### 3. General Jurisdiction

Although plaintiffs and defendants have offered evidence as to the general jurisdiction of this court to hear this case and as to the contacts that should be imputed to defendants via theories of agency, this court declines to consider these arguments as it has made sufficient findings to exercise specific jurisdiction over the defendants.

### III. Forum Non Conveniens

### A. Standard

■ The doctrine of *forum non conveniens* enables a court to exercise its discretion to dismiss a case on the grounds that the plaintiff's chosen forum is so inconvenient that it would be unfair to conduct the litigation in that forum. *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055. Federal courts may invoke *forum non conveniens* at their discretion, so long as an alternative forum exists for the plaintiff's claims. *Piper Aircraft v. Reyno,* 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Gilbert,* 330 U.S. at 505, 507–08. Generally the plaintiff should not seek to "vex, harass, or oppress the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. The Supreme Court has emphasized that in applying the doctrine, no one factor should be determinative, but that the court should weigh considerations of fairness and convenience. *Piper Aircraft,* 454 U.S. at 249–50, 102 S.Ct. 252. Such considerations include the private interests of the litigant, measured by access to sources of proof, availability

of compulsory process for unwilling witnesses, cost of attendance of willing witnesses, and enforceability of a judgment. *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. Likewise, the court should consider matters of public interest, including whether the people most interested in the litigation reside in the state, whether the people of the state have an interest in the litigation that would justify imposition of jury duty upon them, and whether the court will be applying the law of its own forum. *Id.* at 509, 67 S.Ct. 839.

In general, the Supreme Court has found that the doctrine of *forum non conveniens* permits a U.S. court to decline to exercise jurisdiction over a case when a foreign tribunal can more appropriately conduct the litigation. *Piper Aircraft*, 454 U.S. at 250, 102 S.Ct. 252. In the Piper opinion, the Court further held that the availability of a different or lessor remedy in a foreign court did not provide grounds for refusing dismissal for *forum non conveniens*, so long as the forum permits "litigation of the subject matter of the dispute." *Id.* at 254, 102 S.Ct. 252.

The Supreme Court had not explicitly ruled, however, on whether *antitrust* claims may now be dismissed on the grounds of *forum non conveniens*. Initially, the Supreme Court found that Congress did not intend courts to apply the doctrine of *forum non conveniens* to a domestic antitrust claim. The Court based its finding on evidence of Congress's intent to broaden venue provisions in order to increase plaintiffs' access to relief from antitrust violations. *United States v. National City Lines, Inc.*, 334 U.S. 573, 582, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) [hereinafter "National City I"]. The Court also made clear that the special venue provisions of the Clayton Act applied in a suit involving an international party. *See United States v. Scophony Corp. of Amer-*

*ica*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091). In 1940, Congress enacted 28 U.S.C. § 1404(a), which permitted district courts to authorize a change in venue for "the convenience of parties and witnesses." In light of this statute, the Supreme Court subsequently held that federal courts could transfer Sherman Act claims from one district to another on grounds analogous to *forum non conveniens*. *United States v. National City Lines, Inc.*, 337 U.S. 78, 69 S.Ct. 955, 93 L.Ed. 1226 (1949) [hereinafter "National City II"]. As several courts have subsequently noted, application of section 1404(a) has less severe consequences than application of the doctrine of *forum non conveniens:* under section 1404(a), cases may be transferred to a more convenient forum, whereas under the doctrine of *forum non conveniens*, cases may be dismissed and then must be refiled in a more convenient forum. *See Piper Aircraft*, 454 U.S. at 253, 102 S.Ct. 252.

According to the Fifth Circuit, the Supreme Court's decision to permit transfer of antitrust cases does not alter the Court's prohibition of *forum non conveniens* analysis of antitrust cases; cases not subject to transfer, specifically, cases in which the more convenient forum is not in the United States, should not be subject to *forum non conveniens* analysis at all. *Industrial Investment Development Corporation v. Mitsui & Co., Ltd.*, 671 F.2d 876, 890 (5th Cir.1982) (vacated on other grounds). In contrast, the Second Circuit contends that the Supreme Court did not disallow the application of *forum non conveniens* doctrine in antitrust cases involving foreign parties. *Capital Currency Exchange, N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 607–09 (2d Cir. 1998) (finding that National City II "left open the possibility that an antitrust case could be dismissed under the *forum non*

*conveniens* doctrine, even if section 1404(a) did not apply.")

While this court agrees that a *forum non conveniens* motion which results in dismissal of an action has more severe consequences than a motion to transfer a case, the consequences of a dismissal for *forum non conveniens* are not so severe that the issue should be dispositive. An essential consideration in a dismissal for *forum non conveniens* is whether an adequate alternative forum for the claim exists. Without such a forum, a matter can not be dismissed on *forum non conveniens* grounds. Thus, while parties must undertake the expense and inconvenience of refiling their claims, such expense and inconvenience is not so significant that courts should permit transfer of cases on grounds of convenience but should never consider the convenience of parties whose claims are subject to dismissal and refiling.

Underlying the Fifth and Second Circuits' different views on the significance of the Supreme Court's silence is a disagreement over whether U.S. antitrust law provides a categorically unique cause of action. The Fifth Circuit contends that U.S. antitrust laws have no parallel in foreign jurisdictions, that the Sherman Act was designed to protect American commerce and, as a penal statute, would not be executed by courts of another country, according to principles of International Law. *Mitsui,* 671 F.2d at 891. The District Court of the District of Columbia concurred in 5th Circuit's analysis:

> Antitrust cases are unlike litigation involving contracts, torts or other matters recognized in some form in every nation. A plaintiff who seeks relief by means of one of these types of actions may appropriately be sent to the courts of another nation where presumably he will be granted at least approximately, what he is due. But the antitrust laws of the United States embody a specific congressional purpose to encourage the bringing of private claims in the American courts in order that the national policy against monopoly may be vindicated. To relegate a plaintiff to the courts of a nation which does not recognize these antitrust principles would be to defeat this congressional direction by means of a wholly inappropriate procedural device.

*Laker Airways Ltd. v. Pan American World Airways,* 568 F.Supp. 811, 818 (D.D.C.1983). In *Laker,* the D.C. District Court determined that British courts did not provide a cause of action for antitrust violations. *Id.* at 817. The Second Circuit has subsequently found, however, that although British courts will not enforce the Sherman Act, the plaintiff could challenge the defendants' allegedly anti-competitive actions under Articles 85 and 86 of the Treaty of Rome, which, the court found, British courts are bound to enforce. *Capital Currency Exchange, N.V. v. National Westminster Bank PLC,* 155 F.3d 603, 610 (2d Cir.1998). The Second Circuit's decision is based on a British Court ruling published a year after the D.C. Circuit's opinion. *See Capital Currency,* 155 F.3d at 610, citing *Garden Cottage Foods Ltd. v. Milk Mktg. Bd.,* [1984] 1 AC 130.

This court agrees with the Second Circuit and finds that, for the purposes of *forum non conveniens* analysis, U.S. antitrust law is not categorically distinct from the antitrust laws that are enforceable in certain other nations. As a result, the doctrine of *forum non conveniens* is appropriately applied in antitrust cases. While certain countries may have no parallel legislation, others may provide a sufficiently similar cause of action through their domestic law or through treaty obligations like those identified by Great Britain in Case 127/73, BRT v. SABAM, [1974]

ECR 51. Whether other nations' courts will enforce U.S. antitrust law is therefore not dispositive. Likewise, in light of the *Piper* decision, the fact that other nations do not provide treble damages for antitrust violations is not an appropriate grounds for restricting an antitrust claim to a United States forum.

Therefore, this court begins its analysis of whether this court is an appropriate forum for CSR's complaint by considering whether there is an adequate alternative forum for adjudication of the plaintiffs' claims. To determine whether an adequate alternative forum exists, the court must consider whether (1) the defendant is amenable to process in the alternative forum, and (2) the subject matter of the lawsuit is cognizable in the alternative forum. *Piper Aircraft,* 454 U.S. at 255, n. 22, 102 S.Ct. 252.

## B. Application

The defendants contend that they are each amenable to jurisdiction and service of process in Australia, citing the service of suit clauses in a majority of the relevant contracts subjecting the defendants to jurisdiction in Australia and appointing and agent for service of process; defendant CIGNA Corp. has also filed a lawsuit in this matter against CSR in the Supreme Court of New South Wales, and has thereby submitted to jurisdiction in Australia.

The defendants also contend that Australian law provides an analogous form of relief for each of the plaintiffs' claims, including breach of contract, breach of utmost duty of good faith, tortious interference with contractual relations and illegitimate interference with prospective economic advantage, competition restrained and "antitrust injury."

The plaintiffs do not contest defendants' amenability to jurisdiction or service of process in Australia. Instead, they assert that the Australian High Court's decision in *CSR Ltd. v. CIGNA Ins. Australia Ltd.,* 189 C.L.R. 345 (1997) precludes defendants' motion on the grounds of collateral estoppel. Plaintiffs also contend that this opinion demonstrates that plaintiffs are not afforded the same remedy for antitrust violations in Australia as they are in United States courts.

## 1. Collateral Estoppel

■ This court finds that defendants are not collaterally estopped from bringing their motion for *forum non conveniens.* A party is estopped from bringing a claim when "(i)the party to be estopped was a party or in privity with a party in the prior action; (ii) the issue to be estopped is the same as that previously litigated; and ( iii) the issue was actually litigated (or finally resolved) and necessary to the prior judgment." *Eason v. Linden Avionics, Inc.,* 706 F.Supp. 311, 316 (D.N.J.1989).

■ CSR fails to demonstrate that the second criteria applies in this case, that is, that the issues currently before the court were already litigated in Australia. While the Australian court applied its doctrine of *forum non conveniens,* it based its analysis on an issue not before this court, specifically, that two actions were then pending which impacted each other's outcome: the U.S. action and the New South Wales action. The court sought to determine whether either of the actions were "vexatious and oppressive" by establishing whether either suit had been filed to interfere with the other. The court found that the U.S. suit could not be vexatious and oppressive under the Australian standard because it had been filed first, while the New South Wales suit was vexatious and oppressive because it was filed second and was intended to prevent the resolution of the U.S. case. The court noted that by interfering with the resolution of the U.S.

case, the defendants prevented the plaintiffs from obtaining antitrust remedies only available under the Sherman Act in the United States.

Thus, the Australian court undertook to select which of two actions should be heard first, while this court must determine whether it or another court should hear a single action, or whether it should be dismissed and re-filed in another forum. The Australian court did not address the issue of whether the plaintiffs' institution of their suit in U.S. court as opposed to in the courts of Australia was intended to inconvenience and therefore harass the defendants. The only overlapping consideration of the two courts is the uniqueness of the United States' antitrust remedy. The Australian court, however, addressed this issue only to establish that plaintiffs' interests would be hampered by not being able to pursue U.S. claims; the Australian court did not determine that other convenience concerns were moot because the Sherman Act provided a cause of action unique to the U.S. By granting the Australian decision comity, this court will not have resolved the defendants' assertion that the United States is an inconvenient forum in which to litigate the plaintiffs' claims.

This court also finds that the Australian High Court did not determine whether Australian law provides a comparable cause of action to that of the Sherman Act. The opinion of the Australian High Court addressing this issue explicitly states that the distinction it finds between the Australian and U.S. causes of action in antitrust lies in the remedy available:

> The respondents argued that too much attention should not be paid to the availability of treble damages under the Sherman Act. Their contention was that any claim under that Act depended upon the existence of a contract, induced by

coercion or duress, and that relief in such circumstances was available in Australia under the Trade Practices Act of 1974 and by actions for economic torts. Even if they are correct in this contention, the proceedings brought in the United States District Court, in addition to alleging torts of an economic nature, rely expressly upon SS 1 of the Sherman Act and seek the "statutory damages" available under that Act. That entitlement is not available in this country.

*CSR Ltd. v. CIGNA Ins. Australia Ltd.,* 189 C.L.R. 345 (1997). The Court did not rule on whether a comparable cause of action is available under the Australian Trade Practices Act.

Based on a review of the Trade Practice Act, it appears that Australian law provides a cause of action sufficiently comparable to that available under the Sherman Act. Section 45 of Part IV of Australia's Trade Practices Act of 1974, entitled "Restrictive Trade Practices," provides:

> 45. (2) A corporation shall not (a) Make a contract or arrangement or arrive at an understanding, if: (ii) a provision of the proposed contract, arrangement or understanding has the purpose, or would have or be likely to have the effect, of substantially lessening competition;

> 45B. (1) A covenant . . . is unenforceable in so far as it confers rights or benefits or imposes duties or obligations on a corporation or on a person associated with a corporation if the covenant has, or is likely to have, the effect of substantially lessening competition in any market in which the corporation or any person associated with the corporation supplies or acquires, or is likely to supply or acquire, goods or services . . .

> 45D. (1) Subject to this section, a person shall not, in concert with a second person, engage in conduct that hinders

or prevents the supply of goods or services by a third person to a forth person.

Affidavit of Paul William O'Brien, Esq., submitted on behalf of the defendants, at 9–10.

The plaintiffs do not provide evidence that Australian law provides no remedy, or an insufficient remedy, nor does the Australian High Court's opinion suggest as much; the High Court only points out that Australian law does not provide treble damages. Thus, from the evidence before this court, it appears that the parties in this case will not "be deprived of any remedy or treated unfairly" if their case is to be heard before an Australian court. *Piper Aircraft*, 454 U.S. at 255, 102 S.Ct. 252. Instead, they may pursue the same anticompetitive practices which they allege in their U.S. complaint in the Australian forum.

### 2. Public and Private Interests

■ Since the plaintiffs may pursue their claims in either a U.S. forum or in an Australian forum, this court must consider which forum best protects the private interests of the parties and the public's interest in the subject matter of the litigation and in the administration of justice.

In balancing these interests, deference is given to the plaintiff's choice of forum, "unless the balance is strongly in favor of the defendant." This is so primarily when the plaintiff has chosen its home forum, since "it is reasonable to assume that this choice is convenient" for the plaintiff. *Piper Aircraft* 454 U.S. at 256, 102 S.Ct. 252. When the plaintiff is foreign, however, the convenience of its choice of forum is not assumed, and courts have registered their concern that such plaintiffs are simply forum shopping for more advantageous laws. *Id.* Such plaintiffs' choice of forum is not given the same deference. *Id.*

In the instant case, neither of the plaintiff corporations are incorporated in New Jersey, nor are they authorized to do business here. In this respect New Jersey is not the plaintiffs' home forum, nor the most convenient for it. Yet, as a U.S. corporation, plaintiff CSR America is not "foreign" in the sense referred to in prior cases discussing choice of forum (*See Piper Aircraft*, 454 U.S. at 242, 256, n. 24, 102 S.Ct. 252); Likewise, New Jersey is a relatively more convenient forum than Australia. Moreover, CSR America may not be said to be forum shopping for more advantageous federal antitrust law by filing in New Jersey rather than in the state in which it is incorporated.

Most significantly, the plaintiffs present compelling evidence that their choice of a U.S. forum was indeed motivated by convenience: They filed this action after being instructed by an Australian court that in order to proceed with the claims for reimbursement for the amount paid on their insurance claims, they would have to supply proof as to the validity of each claim under the insurance policy. This Australian case was settled before the plaintiffs supplied such proofs, and the plaintiffs proceeded to file an action in New Jersey, where documents establishing the claims were located. According to plaintiffs, at the time of the Australian proceedings, U.S. claims totaled 29,000, and the plaintiffs would have to produce more than 2 million documents in Australia to establish the validity of those claims in the Australian proceeding. Presently, there are approximately 109,000 U.S. claims at issue, and the supporting documents have correspondingly increased. Therefore, this court will grant the plaintiffs a degree of deference in their choice of forum, based on its relative convenience.

This court takes seriously the defendants' assertion that if this case is litigated

in the United States, several of its witnesses will be beyond the compulsory process of this court. As several federal courts have noted, lack of compulsory process is a very significant issue in deciding a motion on the grounds of *forum non conveniens. See Kurzke v. Nissan Motor Corporation in U.S.A.*, 320 N.J.Super. 386, 398 n. 3, 727 A.2d 481 (1999) (surveying federal cases). Whether the case is heard in Australia or in the United States, however, the witnesses of one or the other party will be placed beyond the subpoena power of the court. CSR contends that it will need to present documentary evidence and testimony from numerous U.S. witnesses on the condition of CSR asbestos fiber when it arrived in Manville, Manville employees' knowledge of the health risks of asbestos, the condition of the asbestos in products sold by Manville and the ways in which subsequent users would be exposed to asbestos through those products, in addition to information about whether CSR's asbestos fibers caused the diseases of Manville employees. Certain documentation of the claims had already been transported to Australia prior to settlement of the litigation there; however, a sizeable majority of U.S. claims have been brought subsequent to this production. Likewise, the defendants assert that they will need to produce evidence related to CSR's operations at Wittenoom. Australia, where the asbestos used at Manville was mined, evidence of negotiations of the insurance policies between CSR and the defendants, evidence of CSR's communication with its insurers about its asbestos risk and the pending claims, and evidence of the generation of the claims withdrawal letter, evidence which is all located in Australia or in England.

Neither party has demonstrated that, on balance, its witnesses are more essential to resolving the issues in this case. Both CSR's original liability and the liability of its insurers are essential issues in the case. CSR has shown, however, that the volume of documentation it must produce is considerably larger than that which the defendants must produce. CSR must provide proofs for 109,000 claims, as well as general proofs of its liability to Manville employees, via documents and witness located in the United States; in contrast, the evidence and witnesses in Australia are those involved in the formation of an insurance contract and the subsequent negotiations regarding renewal of that contract. Based on the evidence before it, the interests of the plaintiffs in litigating this case in the United States are at least as great as the interests of the defendants in litigating the case in Australia.

Likewise, New Jersey takes a substantial public interest in the just resolution of the plaintiff's claim. CSR seeks reimbursement for claims stemming from asbestos contamination at a New Jersey plant. CSR has already paid a large percentage of these claims, approximately 96,000, and approximately 13,000 claims remain to be settled; therefore, the defendants contend that New Jersey residents do not have an interest in CSR's reimbursement. If such were the policy of New Jersey courts, however, companies like CSR would have an incentive not to provide rapid reimbursement of claims, in anticipation of their own need to seek redress.

In evaluating New Jersey's interests as part of a choice of law analysis, the New Jersey Supreme Court has noted that even in instances where an insurance company has advanced funds or committed to advance funds to resolve an environmental claim, New Jersey has an interest in ensuring that sufficient funds remain available until the environmental clean up has been completed, whether or not the company undertaking the clean up appeared to

be large enough to provide the funds. *Unisys Corp. v. Insurance Co. of North America,* 154 N.J. 217, 221–222, 712 A.2d 649 (1998). Even more importantly, the Court noted that penalizing a company that advances funds to expedite cleanup would "turn public policy on its head" by discouraging rapid payment of claims. *Id.* The Third Circuit has noted that the state's interests in the resolution of environmental claims that develop out of state are distinct from its interests in products liability injuries which occur out of state, since the environmental harms may "come to rest" at a New Jersey site. *See NL Industries, Inc. v. Commercial Union Ins. Co.,* 65 F.3d 314, 322–323 (3d Cir.1995). In the instant case, however, the products liability injury occurred inside New Jersey, and therefore New Jersey has a strong interest in prompt payment of injury claims to its residents. Declining CSR jurisdiction because its subsidiary has already paid a large proportion of the claims owed against it could discourage prompt payment of the remaining claims, and could also inhibit prompt payment of claims in future cases.

The defendants assert that Australia has a compelling interest in adjudicating this dispute, because CSR's asbestos mine in Wittenoom, Australia has caused great harm to the Wittenoom community, and because the insurance contract and renewal were negotiated in Australia. The court finds that the instant litigation does not impact residents of Wittenoom, but only addresses the insurance claims of the New Jersey employees who were exposed to CSR's asbestos. Therefore, residents of Wittenoom do not have a public interest in this adjudication. Australia does have an interest in the enforcement of contracts formed in Australia, but New Jersey's interest in the prompt payment of liability claims is a significant counterweight to Australia's interests.

■ The defendants also assert that New Jersey's entire controversy doctrine militates against adjudication of the plaintiffs' claims in New Jersey courts. According to the defendants, because CSR proceeded against four different insurers in an action in Australia for insurance coverage for asbestos claims in the United States and Australia, and did not join the instant defendants in that action, CSR is now barred from proceeding against the instant defendants in New Jersey.

Under the entire controversy doctrine, all issues relating to a single dispute between the parties must be completely determined in one action. *Jones v. Holvey,* 29 F.3d 828, 829–30 (3d Cir.1994). The Supreme Court of New Jersey has extended the entire controversy doctrine to bar claims that could have been brought in jurisdictions outside of New Jersey, against different parties than those involved in the New Jersey litigation, so long as the parties are all involved in the same controversy. *Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 N.J. 336, 338, 662 A.2d 536 (1995). According to the Supreme Court of New Jersey, in considering whether different claims are part of the same controversy, "the central consideration is whether the claims against the different parties arise from related facts or the same transaction or series of transactions." *DiTrolio v. Antiles,* 142 N.J. 253, 662 A.2d 494 (1995).

In the instant case, CSR's claims before the Australian Court involved different core facts than those before this court. Specifically, in the NZI procedings, CSR litigated coverage on policies covering its activities prior to 1978, while in this case, CSR is litigating coverage for policies spanning from 1978 to 1986. These policies involved different contracts between different parties for coverage of different

time periods, and therefore presumably address different claims. The only common element is that the underlying claims for which CSR seeks reimbursement stem from CSR's sale of asbestos over several years. In contrast, cases in which New Jersey courts have applied the entire controversy doctrine generally involve a single incident for which several defendants may be found liable. *See, e.g. Harley Davidson Motor Co., Inc., v. Advance Die Casting, Inc.,* 150 N.J. 489, 696 A.2d 666 (1997) (involving claims of a merchant against a supplier in a single products liability case); *Mortgagelinq,* 142 N.J. 336, 662 A.2d 536, (involving a set of co-participants in a single insurance fraud scheme); *DiTrolio,* 142 N.J. 253, 662 A.2d 494, (involving a set of hospital employees in a claim for denial of staff privileges); *Newmark v. Gimbel's, Inc.,* 54 N.J. 585, 601, 258 A.2d 697 (1969) (involving single strict liability claim against both retailer and dealer); *Applestein v. United Bd. & Carton Corp.,* 35 N.J. 343, 356, 173 A.2d 225 (1961) (involving a shareholder's suit enjoining a single merger). Therefore, the commonality identified by defendants between the claims in the instant case and the claims litigated previously in Australia is not a sufficient basis for requiring a single adjudication of both sets of claims.

Finally, the defendants assert that choice of law issues support litigation of the claims in Australia. According to the defendants, Australian law should be applied to "a majority, if not all" of plaintiffs' complaints. The defendants admit that U.S. law should be applied to the plaintiffs' Sherman Act claims, but reference an excerpt from the testimony of Professor Andreas Lowenfeld, CSR's expert witness, that Australian law should be applied to issues of coercion, misrepresentation, and tortious interference with contractual relations.

The U.S. Supreme Court has found that an action should be tried in a district familiar with the law governing the case. *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839. The defendants acknowledge, however, that "this Court is not required to determine choice of law at this time, and that choice of law considerations should not be given conclusive or substantial weight." The court finds that the evidence submitted by the defendants in support of their claim, a half-page of conclusory testimony by Professor Lowenfeld and CSR's submission on choice of law in a separate action, does not adequately support the defendants' contention that choice of law concerns weigh in favor of hearing this case in Australia. Therefore, the court makes no finding on choice of law considerations at this time.

Thus, this court finds that on balance, the public and private interests of the parties weigh in favor of litigating the plaintiffs' claims in New Jersey. As a result, this court declines to dismiss this case on the basis of *forum non conveniens.*

## IV. Conclusion

According to the findings in the opinion above, and in conjunction with the order issued this same day, the defendants' motion to dismiss for lack of personal jurisdiction and the defendants' motion to dismiss on the grounds of *forum non conveniens* are DENIED.