**NATIONAL HOCKEY LEAGUE
PLAYERS' ASSOCIATION,**
Plaintiff,

v.

**PLYMOUTH WHALERS HOCKEY
CLUB d/b/a Plymouth Whalers
et. al., Defendants.**

No. 01–70968.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 27, 2001.

William A. Sankbeil, Joanne G. Swanson, Kerr, Russell, Detroit, MI, Michael P. Conway, John R. McCambridge, Kelly C. Wilson, Grippo & Elden, Chicago, IL, for Plaintiff.

Stephen Wasinger, Gregory D. Hanley, Wasinger, Kickham, Royal Oak, MI, for Defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS

ROBERTS, District Judge.

### I. *Introduction*

This antitrust action is before the Court on Defendants' Motion to Dismiss Based on *Forum Non Conveniens* and Lack of Standing, and the Canadian Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. For the reasons stated below, the Court will delay a decision regarding the propriety of exercising personal jurisdiction over Defendant David Branch until the parties have conducted discovery on that issue. Otherwise, the Court will deny the Motions in their entirety.

### II. *Background*

Plaintiff the National Hockey League Players' Association ("Plaintiff") has brought this suit against the Ontario Hockey League ("OHL"), twenty of the OHL hockey clubs, and OHL Commissioner David Branch. Plaintiff seeks to enjoin Defendants from continuing an agreement that Plaintiff deems "an illegal group boycott and concerted refusal to deal." (*Complaint* at 1).

Almost all of the parties in this action are Canadian. Plaintiff is an unincorporated labor organization, organized under the laws of Ontario. The OHL is one of three member leagues within the Canadian Hockey League. And, the vast majority of the OHL clubs listed as Defendants are located within Ontario, Canada.

Yet, the parties have clear connections with the United States. Although Plaintiff is an Ontario organization, it is also the exclusive bargaining representative of all present and future hockey players in the National Hockey League ("NHL"). Further, according to Plaintiff's Complaint, two of the Defendant teams are located in Michigan (in Plymouth Township and in Sault Ste. Marie), and one is located in Erie, Pennsylvania.[1] Other clubs located in Ontario are within an easy driving distance with Southeastern Michigan (e.g., Windsor and Sarnia). Additionally, ac-

---

1. However, in his Declaration, Defendant David Branch alleges that there are only two OHL located in the U.S.—the one in Plym- outh and the one in Erie. No mention is made about the Sault Ste. Marie club. (*Dfts' Br.*, Ex. A at ¶ 5).

cording to Plaintiff, the OHL is a major source of players to the NHL; 39 OHL players were selected by NHL clubs in 2000. Various financial and other agreements have also been entered into between the OHL and NHL.

Perhaps most significantly, the only hockey players affected by the rule Plaintiff challenges are players for U.S. colleges. The rule at issue—the "Van Ryn Rule"—derived its name from Mike Van Ryn, a former hockey player for the University of Michigan. Van Ryn was drafted by the New Jersey Devils, a NHL club, in June 1998. Consequently, New Jersey had the exclusive rights vis-a-vis other NHL clubs to negotiate with Van Ryn. Those exclusive rights, however, did not extend to clubs within the OHL.

As Plaintiff explains it, the OHL allows each club to have up to three 20 year old, dubbed "overage," players on their rosters.[2] Despite being drafted by New Jersey, Van Ryn signed to play for the OHL's Sarnia Sting for the 1999–2000 season. Sarnia's signing of Van Ryn meant that, pursuant to the collective bargaining agreement ("CBA") between the NHL and Plaintiff, New Jersey's exclusive rights extended until June 1, 2000. Unless New Jersey signed Van Ryn by that date, he would become an unrestricted free agent, free to negotiate with any NHL club. In an effort to prevent that, New Jersey deemed Van Ryn a "defected" player, meaning that, at most, he could become a restricted free agent over whom New Jersey would retain some rights. The NHL supported New Jersey's action. Plaintiff did not.

Plaintiff filed a grievance on Van Ryn's behalf and prevailed. Van Ryn, thus, became an unrestricted free agent and signed a contract with the St. Louis Blues for significantly more than he would have attained from New Jersey.

NHL's support of New Jersey is relevant here because, according to Plaintiff, the NHL exerted its influence over the OHL to get it to establish the Van Ryn rule. To explain the NHL's ability to influence the OHL, Plaintiff detailed their relationship: The NHL and OHL are affiliates under the CBA between the NHL and Plaintiff; the NHL provides coaches, scouting, club management and player consultation services to the OHL; the NHL and OHL have detailed rules allowing the loan and recall of players from the OHL to the NHL; the OHL clubs provide rink advertising space to promote the NHL; and, the NHL makes substantial financial payments to the OHL.

According to Plaintiff, the NHL and Commissioner Branch influenced the OHL clubs to adopt the Van Ryn Rule, prohibiting 20 year old U.S. college players from playing in the OHL.[3] Defendants have relied upon the Van Ryn Rule to refuse to hire 20 year old U.S. college players.

In its Complaint, Plaintiff alleges that Defendants have violated the Sherman Act and the Michigan Antitrust Reform Act by enacting the Van Ryn Rule, a Rule that hurts 20 year old players for U.S. college

---

**2.** Apparently, the 20 year old players are "overage" because, under OHL eligibility rules, its players generally range in age from 16 to 19. (*Dfts' Br.*, Ex. A at ¶ 6).

**3.** The actual text of the Rule states, "It should be understood that to sign and register an overage player, such player must have been on a CHA or USA Hockey Player's Registration Certificate in the previous season."

(*Dfts' Br.*, Ex. A–1). Defendants acknowledge that the Rule has the effect Plaintiff alleges. Defendants state that the Rule "restricts the ability of 20 year old NCAA college players from playing in the OHL." (*Dft's Br.* at 1). They explain, "Typically, players for a NCAA college hockey team will not satisfy this requirement because the NCAA does not allow persons holding a CHA certificate to play hockey at an NCAA School." (*Id.*, n. 1).

teams as well as other NHL players, who are negatively affected by the artificially suppressed salary the Van Ryn Rule causes.

Importantly, Plaintiff seek only declaratory and injunctive relief; it requests no damages.

## III. *Analysis*

### A.

◼ Defendants move the Court to dismiss this action pursuant to the doctrine of *forum non conveniens*. That doctrine allows a district court to exercise its discretion to resist jurisdiction over a case. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). "Under *Gilbert*, dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). *Gilbert* instructed that, when *forum non conveniens* is alleged, a court should consider relevant private and public factors.

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defen-
> dant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.
>
> Factors of public interest also have a place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* at 508, 67 S.Ct. 839.

The *Gilbert* Court emphasized that "[t]he doctrine leaves much to the discretion of the court to which plaintiff resorts," and that "the combination and weight of factors requisite to given results are difficult to forecast or state . . . ." *Id.* This flexible approach to applying *forum non conveniens* factors was upheld in *Piper*.

The Third Circuit in *Piper* had reversed the trial court's dismissal for *forum non conveniens* in the wrongful death actions before it. The district court had dismissed the actions in favor of Scotland, where the plane crashes at issue took place. In reversing, the Third Circuit reasoned that the dismissal in favor of Scotland would

eliminate the plaintiffs' strict liability claims.

The Supreme Court rejected the reasoning of the Third Circuit, stating, "The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." *Id.* at 247, 102 S.Ct. 252. Contrary to the Third Circuit's holding, *Gilbert* had emphasized the need to retain a flexible approach to resolving *forum non conveniens* motions. *Id.* at 249, 102 S.Ct. 252. Further, giving controlling or substantial weight to the possibility of a change in the law would eviscerate the *forum non conveniens* doctrine.

> Jurisdiction and venue requirements are often easily satisfied. As a result, many plaintiffs are able to choose from among several forums. Ordinarily, these plaintiffs will select that forum whose choice-of-law rules are most advantageous. Thus, if the possibility of an unfavorable change in substantive law is given substantial weight in the *forum non conveniens* inquiry, dismissal would rarely be proper.

*Id.* at 250, 102 S.Ct. 252.[4]

Nonetheless, the *Piper* Court allowed that, "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." *Id.* at 255, 102 S.Ct. 252. Elaborating in a footnote, the Court stated:

At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction. *Gilbert*, 330 U.S. at 506–507, 67 S.Ct. at 842. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute. *Cf. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445 (D.Del.1978) (court refuses to dismiss, where alternative forum is Ecuador, it is unclear whether Ecuadorean tribunal will hear the case, and there is no generally codified Ecuadorean legal remedy for the unjust enrichment and tort claims asserted).

*Id.* at 255, n. 22, 102 S.Ct. 252.

Hence, when presented with a motion to dismiss pursuant to the doctrine of *forum non conveniens*, a court must first determine whether the alternative forum advanced is adequate and, if so, then consider the private and public factors outlined in *Gilbert*. However, before beginning that analysis in this case, the Court must preliminarily determine whether the doctrine of *forum non conveniens* is applicable in antitrust actions.

---

**4.** In addition, the Supreme Court emphasized, "The doctrine of *forum non conveniens* ... is designed in part to help courts avoid conducting complex exercises in comparative law." *Id.* The Third Circuit's approach would undermine that objective. *Piper* at 250, 102 S.Ct. 252. Another practical implication of the Third Circuit's holding is that it would increase litigation in the American courts. "The American courts, which are already extremely attractive to foreign plaintiffs, would become even more attractive. The flow of litigation into the United States would increase and further congest already crowded courts." *Id.* at 252, 102 S.Ct. 252.

### B.

Plaintiff alleges that Defendant has violated the Sherman Act, 15 U.S.C. § 1. That antitrust section states:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . .

Private enforcement of antitrust violations was authorized by 15 U.S.C. § 26 of the Clayton Act:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . .

Another provision of the Clayton Act, 15 U.S.C. § 22, allows any district in which a corporation transacts business to serve as a forum in an action against that corporation:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The enactment of § 22 led the Court in *U.S. v. National City Lines*, 334 U.S. 573, 589, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948)("*National City I*") to hold that courts lack "discretion to apply the doctrine of *forum non conveniens* so as to deprive the plaintiff of the choice given by the section." In *National City I,* the Government sued nine corporations that allegedly conspired to control transportation companies in numerous cities within the United States. In their motion to dismiss for *forum non conveniens,* the defendants argued that maintaining the suit in the Southern District of California was inconvenient, and that the Northern District of Illinois was more convenient. The district judge accepted the defendants' argument and dismissed the action without prejudice.

Reviewing the district court's determination, the Supreme Court noted that, statutorily, jurisdiction and venue were proper in California.

> The only question presented concerning the court's power is whether, having jurisdiction and venue of the cause and personal jurisdiction of the defendants, the court also was authorized to decline to exercise its jurisdiction upon finding, without abuse of discretion, that the forum was not a convenient one within the scope of the non-statutory doctrine commonly, though not too accurately, labeled *forum non conveniens*.

*Id.* at 578, 68 S.Ct. 1169.

To answer that question, the Court observed that the Clayton Act expanded the venues within which antitrust actions could be brought against a corporate defendant. Previously, the Sherman Act had allowed antitrust proceedings against a corporation to be brought only in the districts in which that corporation "resides or is found," whereas the Clayton Act allowed such suits in any district in which the corporation transacts business. *Id.* at 579, 68 S.Ct. 1169. The purpose of broadening the venue choices was to:

> '[R]elieve[ ] persons injured through corporate violations of the antitrust laws from the "often insuperable obstacle" of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due.'

*Id.* at 580, 68 S.Ct. 1169, *quoting U.S. v. Scophony Corp. of America,* 333 U.S. 795, 808, 68 S.Ct. 855, 92 L.Ed. 1091 (1948).

The Court considered the intent of the Clayton Act's broad venue provision to be inconsistent with the practice of allowing a plaintiff's venue choice to be defeated for the convenience of the defendant. *Id.* at 580–583, 68 S.Ct. 1169. Congress having spoken, the courts are without discretionary power to defeat the venue provision found in § 22. *Id.* at 589, 68 S.Ct. 1169.

Within days of the June 7, 1948 *National City I* decision, Congress spoke again. On June 25, 1948, Congress passed 28 U.S.C. § 1404. Section 1404(a) read, and still reads, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Upon remand to the District Court for the Southern District of California, the *National City I* defendants relied upon § 1404(a) to file another motion "under the doctrine of *forum non conveniens.*" *U.S. v. National City Lines, Inc.,* 337 U.S. 78, 80, 69 S.Ct. 955, 93 L.Ed. 1226 (1949)("*National City II*"). The district court granted the motion and the Government again appealed.

After consulting § 1404(a)'s legislative history, the *National City II* Court noted that the statute was intended to "expand the transferability of cases." *Id.* at 81, 69 S.Ct. 955. At issue in *National City II* was whether § 1404(a)'s reference to "any civil action" included antitrust and other actions subject to special venue provisions. The Court held that it did.

Although the Court in *National City II* referred to the § 1404(a) motion as one alleging *forum non conveniens,* the Supreme Court has since emphasized that " § 1404(a) transfers are different than dismissals on the ground of *forum non conveniens.*" *Piper* at 253, 102 S.Ct. 252. "District courts were given more discre-

tion to transfer under § 1404(a) than they had to dismiss on grounds of *forum non conveniens.*" *Id.* Notwithstanding, *National City II's* treatment of the defendants' § 1404(a) motion as one alleging *forum non conveniens* lends to the confusion regarding the breadth of its holding. Specifically, did *National City II* authorize only § 1404(a) transfers to other venues? Or, when the alternate forum is a foreign venue, did *National City II* also sanction a *forum non conveniens* dismissal?

Answering that question was *Industrial Inv. Development Corp. v. Mitsui & Co., Ltd.,* 671 F.2d 876 (5th Cir.1982), *vacated on other ground,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). There, the Fifth Circuit held that *National City II* applied only to § 1404(a) transfers, not to *forum non conveniens* dismissals. Rejecting the defendants' argument to the contrary, the court stated:

> Defendants argue that the Supreme Court 'effectively nullified' its holding in [*National City I* ] its second decision in that case, [*National City II* ].... In *National City Lines II,* the Court, relying on the legislative history and the broad term 'any civil action,' concluded that the transfer statute applied to antitrust actions. 337 U.S. at 80–84, 69 S.Ct. at 956–58. The Court in no way questioned its earlier holding concerning the effect of 15 U.S.C. § 22 on common law *forum non conveniens.* Since defendants can point to no statute authorizing dismissal of an action on *forum non conveniens* grounds, *National City Lines II* does not help them in any way.

*Id.* at 890, n. 18, 68 S.Ct. 1169. The court therefore held that, pursuant to *National City I,* it was error to grant the defendants' motion to dismiss because Indonesia was a more convenient forum. "The common law doctrine of *forum non conveniens*

is inapplicable to suits brought under the United States antitrust laws." *Id.*

*Mitsui* further held that it would reject the defendants' *forum non conveniens* claim even in the absence of *National City I*. It reasoned that foreign courts would not apply the Sherman Act, which authorizes treble damages in order to penalize and prevent antitrust violations. "A dismissal for *forum non conveniens,* then, would be the functional equivalent of a decision that defendants' acts are beyond the reach of the Sherman Act." *Id.* at 890–891, 68 S.Ct. 1169.

In contrast to *Mitsui,* the court in *Howe v. Goldcorp Investments, Ltd.,* 946 F.2d 944 (1st Cir.1991), held that the doctrine of *forum non conveniens* is applicable in an action filed pursuant to the Securities Exchange Act of 1934, which, like the Clayton Act, includes a special venue provision. According to *Howe, National City II* "overruled" *National City I* in its entirety. *Id.* In response to the argument that § 1404(a) applies only to domestic transfers and that *National City II,* therefore, did not overrule *National City I* with respect to international transfers (really dismissals), the *Howe* court pointed out: "[T]he Court in *National City Lines I* considered only domestic transfers; it did not consider international transfers at all." *Id.* Hence, since *National City I* never ruled on the applicability of the *forum non conveniens* doctrine to cases in which the alternative forum is in a foreign country, *National City II* could not have preserved such a ruling. "Moreover, § 1404(a) at the least reflects a congressional policy strongly favoring transfers." *Id.*[5]

In accord with *Howe,* the court in *Capital Currency Exchange, N.V. v. National Westminster Bank PLC,* 155 F.3d 603 (2nd Cir.1998), rejected the plaintiffs' argument that the doctrine of *forum non conveniens* was inapplicable to antitrust suits. It noted that the *National City II* court did not distinguish § 1404(a) from common law *forum non conveniens* when overruling *National City I, Id.* at 607, 68 S.Ct. 1169.

In a recent district court opinion, *CSR Ltd. v. Federal Ins. Co.,* 141 F.Supp.2d 484 (2001), another reason for rejecting the absolute bar on *forum non conveniens* dismissals in antitrust cases was advanced. The *CSR* court called into question the reasoning of *Mitsui* that dismissing an antitrust action in favor of a foreign forum would deprive the plaintiff of its Sherman Act rights. It stated that allowing *forum non conveniens* dismissals in antitrust actions would not create an unduly severe result because such a dismissal is available only when the alternative forum provides an adequate remedy. *Id.* at 495. After noting that other nations have enforceable antitrust laws, the *CSR* court relied on *Piper* to hold that "the fact that other nations do not provide treble damages for antitrust violations is not an appropriate grounds for restricting an antitrust claim to a United States forum." *Id.*

After consideration of all of the authority previously described, the Court holds that there is no absolute prohibition against applying the doctrine of *forum non conveniens* to antitrust actions. First, *National City I* did not address the application of *forum non conveniens* when the alternative forum is foreign. Consequently, *National City II* could not have pre-

---

**5.** The *Howe* court further distinguished antitrust law from the Securities Act. "[T]he Court in *National City Lines I* relied heavily on the legislative history of the antitrust law's special venue statute. It found, in that history, especially strong reasons for believing Congress did not want to permit courts to transfer cases, irrespective of convenience." *Howe* at 948. The *Howe* court found that no similar "unusual legislative history" pertaining to the Securities Act's venue statute. *Id.* at 949.

served the prohibition Plaintiff alleges. *Mitsui* is thus the only authority supporting Plaintiff's claim that dismissal in favor of foreign forums is not allowed in antitrust suits. And, as *CSR* noted, *Mitsui's* reasoning is flawed. It's conclusion that requiring a plaintiff to file suit in a foreign forum would deprive that plaintiff of its Sherman Act rights ignores the strongly worded holding of *Piper* that an unfavorable change in the law that would follow a *forum non conveniens* dismissal is usually not dispositive.

Consequently, the Court will apply the traditional factors to determine whether a *forum non conveniens* dismissal is warranted.

### C.

■ The Court will deny Defendants' Motion to Dismiss on *forum non conveniens* grounds because Canada does not provide Plaintiff with an adequate alternative forum.

In support of its claim that Ontario is an adequate alternative forum, Defendants refer the Court to the affidavit of Edward W. Purdy, a partner of a Toronto law firm. Purdy claims that "substantially the same remedies as those asserted by the NHLPA in this proceeding would be available in proceedings commenced in Ontario ...." (*Dfts' Br.*, Ex. C at ¶ 15).

Specifically, Purdy states that Canada's Competition Act, R.S.C.1985 c. C–34, applies to the activities of which Plaintiff complains. The Competition Act provides that anyone who conspires, combines or agrees to prevent or lessen competition "is guilty of an indictable offence and liable for an term not exceeding five years or to a fine not exceeding ten million dollars or both." An inquiry into possible violations of the Competition Act may be prompted by an application submitted by six Canadian residents. The Commissioner of Competition may, in response to such an appli-

cation, cause an inquiry into the matter and may submit evidence to the Attorney General of Canada, who is empowered to institute criminal prosecution of the alleged wrongdoers. While the criminal action is pending, the Attorney General may seek interim injunctive relief. Upon conviction, the injunction can be made permanent. (*Dfts' Br.*, Ex. C at ¶¶ 1–11).

Purdy further claims that any person who suffered a loss as a consequence of a violation of the Competition Act may recover damages. He additionally stated that "an injunction may be obtained in Ontario against a breach or a prospective breach of Section 45(1) of the Competition Act ...." (*Id.* at ¶ 13). However, a review of the Ontario court opinion upon which Purdy relies clarifies that the Competition Act does *not* provide for injunctive relief for a person who has been injured as a result of violations of the Act. In order to secure an injunction, a plaintiff must show that the complained of conduct gives rise to a cause of action *independent of* the Competition Act. (*Dfts' Br.*, Ex. C–2 at 8).

Plaintiff argues that Ontario is not an adequate alternative forum. In support, Plaintiff offers the affidavit of the Hon. Lloyd William Houlden, a practicing lawyer who retired from his position as judge on the Court of Appeal for Ontario in 1997. (*Plt's Br.*, Ex. 2 at ¶ 2). Judge Houlden contends that the Competition Act is largely administrative in nature. He states that the Attorney General of Canada is unlikely to institute prosecution for violations of the Act and that the Competition Bureau focuses its budget on combating anti-competitive activity that is most costly to the Canadian public and economy at large. (*Id.* at ¶¶ 10–11).

Judge Houlden recites the texts of two sections of the Competition Act directed at sporting activities. The first, § 6, provides that the Act does not apply to ama-

teur sports. The second, § 48, deals with professional sports, and requires a court to decide whether the challenged agreement maintains a reasonable balance among the teams or clubs participating in the same league. There have been no cases decided under either §§ 6 or 48 and, therefore, it is uncertain which would apply to this case. (*Id.* at ¶ 13).

According to Judge Holden, there have been only 51 prosecutions under the Competition Act. And, of those prosecuted, 19 neither pled or were found guilty. Additionally, § 45(1)(c) of the Competition Act—the section upon which Purdy relied—is inapplicable to the conduct of which Plaintiff complains. (*Id.* at ¶ 15).[6] Judge Houlden contends that there is no authority under the Competition Act for a private complainant to secure an injunction. The sole remedy available in a private action is damages. (*Id.* at 17–19).

In light of the affidavits submitted by the parties, the Court concludes that Canada is not an adequate alternative forum for Plaintiff's claim. The Canadian Competition Act may permit an injured party to file an action for damages as a consequence of the Van Ryn Rule, but that is far from clear. If the OHL is found to be an amateur sporting league, the Competition Act would forbid suit against it and its teams.

Moreover, it is beyond dispute that injunctive relief is not available to Plaintiff

under the Competition Act. Defendant is correct that, pursuant to *Piper*, the absence of that specific type of relief is not controlling so long as Plaintiff has another remedy. But Plaintiff here has no other remedy. Plaintiff has not claimed, and likely cannot demonstrate, that it has sustained damages as a result of the Van Ryn Rule. Any damages would be incurred by the U.S. college players who are prohibited from entering the OHL pursuant to that rule. Since Plaintiff has likely suffered no damages, and since injunctive relief is not available to a private litigant under the Competition Act, Plaintiff has no remedy under Canadian law.

Defendants allege that Plaintiff has an administrative remedy in that it may file a complaint with the Competition Commissioner. However, *Piper* does not appear to consider an administrative remedy adequate. The Court stated, "[D]ismissal would not be appropriate where the alternative forum does not permit *litigation* of the subject matter of the dispute." *Piper* at 255, n. 22, 102 S.Ct. 252, (emphasis added). Furthermore, the evidence suggests that the Commissioner and Attorney General of Canadian are unlikely to pursue to prosecution any complaint that Plaintiff would make.[7] Hence, the Court finds that Plaintiff does not have an adequate forum in Canada.

**6.** Section 45(1)(c) deals with conspiracies to "prevent, lessen, unduly, competition in the production, manufacture, purchase, barter, sale, storage, rental, transportation or supply of produce, or in a price of insurance on persons or property . . . ."

**7.** Plaintiff's inability to pursue its own claim and the improbability that any administrative complaint would result in a prosecution distinguishes this case from *Lueck v. Sundstrand Corporation*, 236 F.3d 1137 (9th Cir.2001), an opinion upon which Defendants rely. In that case, the court found that New Zealand was

an adequate alternative forum even though it did not allow civil actions for personal injury resulting from automobile accidents. New Zealand's Accident Compensation System was adequate because it covered all medical and rehabilitative expenses and a portion of injured parties' lost income. Further, suit could be brought for mental distress not resulting from physical injury, and for the recovery of punitive or exemplary damages. *Id.* at 1141–1142. Therefore, unlike in this case, the plaintiff had clear avenues for seeking adequate relief in New Zealand.

### D.

■ Furthermore, an analysis of the private and public factors outlined in *Gilbert* does not weigh in favor of disturbing Plaintiff's choice of forum.

Defendants claim that the private and public interests weigh overwhelmingly in favor of dismissal. Regarding the private interest, Defendants argue that the vast majority of the documents and witnesses are located in Canada. But, it does not appear that a substantial amount of documents or witnesses are necessary for the resolution of this case. The parties are in agreement regarding the meaning of the Van Ryn Rule, so, the dispute is largely a legal rather than a factual one. The primary factual dispute that the Complaint raises is to what extent the Van Ryn Rule resulted from pressure from and/or a conspiracy with the NHL. The Canadian witnesses and documents pertaining to the conspiracy and any other issue are within the control of the Canadian Defendants. And, as Plaintiff points out, the nonparty witnesses and documents affiliated with the NHL are subject to the compulsory rules of production set forth in the Federal Rules of Civil Procedure.

Moreover, Defendant cannot argue that litigation in this Court will be particularly costly. Ontario is directly across the river from Detroit; many of the teams, e.g., those in Windsor and Sarnia, are closer to Detroit than to Toronto, where they play games against the Toronto St. Michael's Majors. Likewise, the clubs that are located further from Detroit nonetheless travel to this region to play hockey.

In short, the Court finds that Defendants have not demonstrated that the private factors weigh in their favor.

■ Addressing the public interest factors, Defendants claim that Canada has a far greater interest in this litigation than the U.S. The Court rejects this argument. It is undisputed that the Van Ryn Rule is directed to college hockey players who play in the United States; it is U.S. college students who are subjected to the alleged group boycott. Furthermore, the hockey players whose salaries are, according to Plaintiff, artificially suppressed by virtue of the Van Ryn Rule are those who play or are seeking to play for the NHL. Thus, the affects of the Rule are felt more greatly in the United States than in Canada. The public interest factor does not weigh in favor of a *forum non conveniens* dismissal.

\*   \*   \*   \*   \*   \*

For the foregoing reasons, the Court denies Defendants request to dismiss this action pursuant to the doctrine of *forum non conveniens*. Canada is not an adequate alternative forum for Plaintiff's action and the private and public factors do not deem this litigation more convenient or appropriate for a Canadian court.

### E.

■ Defendants additionally contend that Plaintiff lacks standing to bring this action. At issue is whether a representative organization, such as a union, has standing to sue for antitrust injuries inflicted upon its members. The answer to that question largely depends upon the remedy sought.

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Court held that the plaintiff union could not recover treble damages for any indirect injury it incurred by virtue of the defendant multiemployer association's coercion of third parties to hire non-union rather than union contractors. In other words, the union could not recover treble damages for the antitrust injury inflicted directly upon its members.

In contrast, in *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court held that an association may have standing to assert the claims of its members where it has suffered no injury from the challenged activity.

[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. 2434.

The third element—that no individual member participation be required—speaks to the remedy being sought. " '[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.' " *Hunt* at 342–343, 97 S.Ct. 2434, *quoting Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Specifically, associational standing is appropriate when declaratory or injunctive relief is being sought:

'(W)hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to

represent their members, the relief sought has been of this kind.'

*Hunt* at 343, 97 S.Ct. 2434, *quoting Warth* at 515, 95 S.Ct. 2197.

In light of the precedent recognizing associational standing, the *Hunt* court deemed the only genuine issue before it to be whether the plaintiff, the Washington State Apple Advertising Commission, was a proper association to bring suit. *Hunt* at 344, 97 S.Ct. 2434. This was an issue because the Commission was not "a traditional voluntary membership organization" or "a traditional trade association." *Id.* Had it been either of these traditional organizations, "its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court." *Id.* at 342, 97 S.Ct. 2434. The Court determined that the Commission was a proper association to sue on behalf of the Washington State apple industry.

In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests. Nor do we find it significant in determining whether the Commission may properly represent its constituency that 'membership' is 'compelled' in the form of mandatory assessments. Membership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacked standing to assert the claims of its constituents.

*Id.* at 345, 97 S.Ct. 2434.

Consistently with *Hunt*, "A number of federal courts have recognized an association's standing to maintain an antitrust

action seeking injunctive relief on behalf and as the representative of its members." *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1380 (7th Cir.1987), *citing Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 690 (8th Cir.1979); *Mission Hills Condominium Ass'n M–1 v. Corley,* 570 F.Supp. 453, 457–458 (N.D.Ill. 1983); *National Office Machine Dealers Ass'n v. Monroe, The Calculator Co.,* 484 F.Supp. 1306, 1307 (N.D.Ill.1980). "For purposes of determining the standing of an association in a § 16 [injunctive] action, these courts have resorted to traditional doctrines of associational standing." *Id.*

Applying the traditional doctrine set forth in *Hunt* to this antitrust action, the question of whether Plaintiff has associational standing requires this Court to determine: (a) whether Plaintiff's members would otherwise have standing to sue in their own right; (b) whether the interests it seeks to protect are germane to the organization's purpose; and (c) whether the claim asserted requires the participation of individual members in the lawsuit. *Hunt* at 343, 97 S.Ct. 2434.

Regarding the first element, NCAA players who are forbidden from playing in the OHL pursuant to the Van Ryn Rule would have standing to sue in their own right. That is, those players have suffered an antitrust injury. It is clear that group boycotts in the context of professional sports (except baseball) are subject to antitrust scrutiny. See, e.g., *Haywood v. National Basketball Ass'n,* 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971); *Mackey v. National Football League,* 543 F.2d 606, 618 (8th Cir.1976); *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1177 n. 11 (D.C.Cir. 1978).

However, Defendants argue that Plaintiff's members are NHL players, not hockey players within the OHL or the NCAA. Plaintiff responds that, as the CBA between it and the NHL states, it represents the interest of future NHL players. Plaintiff cites concrete evidence that the OHL is a source of future NHL players. Its Complaint states that 39 players from the OHL were drafted into the NHL in 2000. More specifically, Mike Van Ryn was a NCAA player, then an OHL player and then a "future" NHL player at the time that Plaintiff represented him in the arbitration giving rise to the Van Ryn Rule. On behalf of future players, Plaintiff negotiates starting salaries, rules regarding free agency and the like. To borrow from *Hunt,* "In a very real sense, therefore, [Plaintiff] represents the [future NHL players] and provides the means by which they express their collective views and protect their collective interests." *Hunt* at 345, 97 S.Ct. 2434. Following *Hunt,* the Court finds that the future NHL players' lack of formal membership with Plaintiff is not dispositive.

The next issue is whether the interests Plaintiff seeks to protect are germane to the organization's purpose. The answer to that question is, clearly, "Yes." As previously stated, Plaintiff represents the interests of current and future players in negotiations with the NHL in matters regarding salary and free agency status. The injury Plaintiff alleges will occur by virtue of the Van Ryn Rule is that future NHL players will be deprived of the opportunity to attain free agency status and to maximize their earning potential. Further, Plaintiff alleges that the suppressed salaries will impact upon the entire league, not just the new players. Consequently, the interests Plaintiff is asserting are at the heart of its representative responsibility.

The final element requires that no individual member participation be necessary. When, as here, the sole remedy sought is injunctive this element is usually met.

*Hunt* at 342–343, 97 S.Ct. 2434; *Southwest Suburban Bd. of Realtors* at 1380.[8]

In conclusion, the Court holds that Plaintiff has satisfied the elements to establish associational standing.

### F.

■ The Canadian Defendants allege that the Court lacks personal jurisdiction over them. This Court must choose from three alternative procedures for resolving this claim:

> Presented with a properly supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions. The court has the discretion to select which method it will follow, and will only be reversed for abuse of that discretion.

*Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991).

While the plaintiff bears the burden of proof for establishing personal jurisdiction, that burden is significantly lessened when the court relies solely upon the parties' affidavits to render a decision. *Id.* at 1458–1459. When the court relies upon the affidavits, "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Id.* at 1458. It is, therefore, error for a court to resolve factual disputes when relying on affidavits to determine personal jurisdiction challenges; the defendants' factual allegations by affidavit that contradict plaintiff's factual allegations cannot be considered. *See Theunis-*

*sen* at 1459, and *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.1996).

In this case, the Court finds the affidavits are sufficient and that Plaintiff has established a *prima facie* showing of personal jurisdiction with respect to all Defendants except for Commissioner Branch. The Court will allow some discovery to take place before determining whether Branch is subject to personal jurisdiction here.

> In analyzing a motion to dismiss for lack of personal jurisdiction under Fed. R.Civ.P. 12(b)(2), we first determine whether the applicable statute potentially confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction comports with due process.

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 942 (11th Cir.1997).

As previously stated, § 22 of the Clayton Act allows any district in which a corporation is found or transacts business to serve as a forum in an action against that corporation. Of additional significance is the second clause of § 22, which addresses where the corporate defendant may be served:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

---

**8.** In its Reply, Defendants cite some opinions requiring that a union's failure to allege an antitrust injury deemed the union to lack antitrust standing. However, in those opinions, the union was asserting injury to itself rather than to its membership, and the courts held

that the unions' own injury was insufficient. None of Defendants' cases contradict the foregoing authority allowing a union to establish associational standing to enjoin the continued antitrust injury to its membership even when the union has not, itself, suffered an injury.

Courts interpreting § 22 have indicated that that section's second clause authorizes nationwide service of process. *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C.Cir.2000) ("[T]he clause after the semi-colon relates to nationwide service of process in antitrust cases . . . ."); *Go–Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1408 (9th Cir.1989)(stating that § 22 authorizes "worldwide service of process . . . ."). And, nationwide service of process equates to nationwide personal jurisdiction. *BCCI Holdings* at 942, ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction."); *GTE New Media* at 1350, ("[B]oth parties agree that the clause regarding nationwide service also confers nationwide jurisdiction . . . .").

There is, however, a conflict over whether the authorization of nationwide service of process and jurisdiction in the second clause of § 22 is limited by the first clause. The specific question is: if venue is established pursuant to 28 U.S.C. § 1391, the general federal venue statute, but does not comport with the first clause of § 22, may the second clause's national jurisdiction authorization be invoked?

In *GTE New Media*, the court answered, "no." Rejecting the plaintiff's argument that the second clause of § 22 could be invoked even if venue could be maintained only pursuant to § 1391, the court found it clear that "invocation of the nationwide service clause rests on satisfying the venue provision [of § 22]." *GTE New Media* at 1350. In contrast, the *Go–Video* court rejected the defendants argument that the first and second clauses of § 22 constitute an "integrated whole." *Go–Video* at 1408. "[W]e conclude that process may be served on an antitrust defendant pursuant to 15 U.S.C. § 22 in cases where venue is not established under

that section but lies properly under 28 U.S.C. § 1391(d)." [9] *Id.* at 1413.

In its Brief, Defendants note the conflict between *GTE New Media* and *Go–Video*. Defendants then argue that, if § 1391 is the basis for venue, the Court must determine whether personal jurisdiction satisfies Michigan's long-arm statute and the *International Shoe* principles of due process. In so arguing, Defendants miss a key aspect of the analysis. They do not address the preliminary question of whether venue here is proper pursuant to § 22. If so, the conflict between *GTE New Media* and *Go–Video* is irrelevant; if Defendants "may be found or transacts business" in this district, venue is proper under § 22 and there is no dispute that nationwide service of process under the second clause is available.

On the question of whether Defendants transact business in Michigan, the opinion in *Hawkins v. National Basketball Ass'n*, 288 F.Supp. 614 (W.D.Pa.1968), is instructive. In *Hawkins*, the court held that the professional basketball teams at issue transacted business in Pennsylvania, for the purposes of § 22, when they played games there:

> The only business a corporation-owned professional athletic league team could engage in profitably is to systematically play games with other member teams according to Association schedules and play exhibition games in metropolitan cities. From this revenue-producing business, of necessity they enter into contracts for transportation, board, lodging and miscellaneous items with persons in those cities.
>
> To say that these corporations transacted no business of any substantial character in this district would be to disregard the practical nontechnical business stan-

**9.** Section 1391(d) states, "An alien may be sued in any district."

dards applicable to professional athletic teams. The Association schedules were systematic and continuous during the seasons of 1963 through 1966. *American Football League v. National Football League,* 27 F.R.D. 264 (D.Md.1961). As held in that case, "continuous" as applied to the specialized business of operating a professional athletic team does not mean without interruptions.... It is our opinion that the venue requirements as to these corporations have been met within the meaning of § 12 of the Clayton Act on the basis of transacting business in the Western District of Pennsylvania.

*Id.* at 619.

Of additional relevance is the fact that, under prevailing law, "It is clear that the ability to download, transmit or exchange information with a defendant via the computer and the presence of on-line contracts between a defendant and a plaintiff are sufficient for a court to exercise personal jurisdiction over a defendant." *Sports Authority Michigan, Inc. v. Justballs, Inc.,* 97 F.Supp.2d 806, 813 (E.D.Mich.2000).

Here, the OHL has established an OHL franchise in Plymouth, Michigan, and the Canadian clubs play hockey games in Plymouth. Furthermore, the OHL has a highly interactive website in which it advertises and sells tickets and merchandise, and provides links to other OHL teams and to websites providing live broadcasts of OHL games. (*See Plt's Br.,* Ex. 1 at ¶¶ 23–27 & Ex. 1–F). Consequently, the OHL and the Canadian hockey clubs transact business in Michigan, and the venue provision of § 22 is satisfied.

Since the venue provision of § 22 is satisfied, the nationwide personal jurisdiction authority of that section is unquestionably triggered. Under these circumstances, it is the Fifth Amendment's guarantee of due process that must be satisfied. "It is well established that when, as here, a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." *BCCI Holdings* at 942. In the Sixth Circuit, Fifth Amendment due process is satisfied by demonstrating that the defendant has minimum contacts with the United States as a whole rather than focusing on the forum state. *Medical Mut. of Ohio v. deSoto,* 245 F.3d 561, 567–568 (6th Cir.2001). In so holding, the *deSoto* court reaffirmed *Haile v. Henderson Nat. Bank,* 657 F.2d 816, 824 (6th Cir.1981), which stated, "In an action where service of process is effected pursuant to a federal statute which provides for nationwide service of process, the strictures of *International Shoe* do not apply."

The court in *Dunham's, Inc. v. National Buying Syndicate of Texas,* 614 F.Supp. 616, 623 (E.D.Mich.1985), applied *Haile* to the antitrust matter before it:

Although the *Haile* decision, *supra,* by which this court is bound, has been disfavored by commentators, its teachings apply to the present case. In a federal antitrust action, such as here, the court's determination concerning personal jurisdiction is guided by the national standards of due process under the fifth amendment. An *International Shoe* 'minimum contacts' analysis need not be performed under these circumstances. *Haile,* 657 F.2d at 824. The pertinent inquiry here is whether service was reasonably calculated to inform defendants of the pendency of the action against them so that they would have an opportunity to present a defense to the charges pending. *Haile,* 657 F.2d at 826, *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

In this case, the Canadian Defendants that are hockey clubs play against OHL teams in Michigan and Pennsylvania and the OHL has an interactive website that allows U.S. residents to purchase merchandise. Additionally, the arbitrator who ruled in favor of Van Ryn found that the OHL and its teams are affiliated with the NHL. (*Plt's Br.*, Ex. 1–C at 15).[10] This is significant because the NHL is headquartered in New York and 24 of its 30 teams are in the United States. (*Id.*, Ex. 1 at ¶ 10). The Court therefore finds that the Canadian Defendants have established the necessary minimum contracts with the United States. Additionally, the Canadian Defendants do not dispute that service was reasonably calculated so as to give them the opportunity to present their defenses. Consequently, the exercise of personal jurisdiction over them comports with Fifth Amendment due process.

There is, however, a void of evidence regarding Branch's contacts with the U.S. In light Branch's position as the Commissioner of a hockey league that has clubs in Michigan and Pennsylvania and that is affiliated with the NHL, however, the Court will not grant Branch a dismissal at that time. Instead, some discovery regarding Branch's contacts with the United States before the Court decides whether the exercise of personal jurisdiction over him is proper.

For all these reasons, the Court holds that Plaintiff has established that personal jurisdiction over the Canadian Defendants, except Commissioner Branch, is proper.

## IV. *Conclusion*

For the foregoing reasons, **THE COURT HEREBY DENIES** Defendants' Motion to Dismiss Based on *Forum Non Conveniens* and Lack of Standing [**document 7–1**], and **DENIES** the Canadian Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [**document 7–2**], except that the Court **RESERVES** its decision regarding whether the exercise of personal jurisdiction over Defendant David Branch is proper. The parties are instructed to conduct discovery relating to Defendant Branch's contacts with the United States and to submit supplemental briefs in accordance with a forthcoming pre-trial schedule.

---

**10.** The arbitrator found:

The record reveals that agreements between the NHL and the CHL go back for more than 40 years. The current agreement between the NHL and the CHL provides significant benefits for each party. Among such benefits are the following. The NHL makes substantial financial payments to the CHL and funds various resources for the CHL players. The NHL also cooperates in providing certain resources, where possible, to CHL member clubs such as coaching, scouting, club management and player consultation. The CHL provides the NHL with financial information regarding the operation of its member clubs. Rules exist for the loan and recall of NHL players to and from the CHL. CHL games are played according to NHL rules. NHL clubs at their opinion may undertake the rehabilitation of injured CHL players. Each CHL club agrees to use its best efforts to provide rink advertising space for the purpose of promoting the NHL.

(*Plt's Br.*, Ex. 1–C at 15).